(No. 23214.—

DAVID VLAHOS *et al.* Defendants in Error, *vs.* FRANK J. ANDREWS *et al.* Plaintiffs in Error.

*Opinion filed February 14, 1936—Rehearing denied April 10, 1936.*

C. E. McNemar, and A. G. Harris, for plaintiffs in error.

J. L. Spaulding, and Josef T. Skinner, (Arthur H. Ellis, of counsel,) for defendant in error David Vlahos; Wilson & Wilson, for other defendants in error.

Mr. Justice Orr delivered the opinion of the court:

A chancery decree of the circuit court of Bureau county is the subject matter of this review by writ of error, a freehold being involved.

The suit was commenced by defendant in error Vlahos, who filed his bill, later amended, asking for a decree that would compel plaintiffs in error, Frank J. Andrews and

his wife Jane, to convey the real estate involved either to him or to John T. and Paul T. Pappas, brothers. These last named brothers were the immediate grantors of the same property to both Vlahos and Andrews. The property in question is a mercantile building and lot in Princeton. The tenants, trustees and lien-holders, together with the Pappas brothers, were made defendants. Prior to this action, these same parties sued Andrews for an alleged debt and this suit, by stipulation, was consolidated with the present proceeding. After this consolidation, the Pappas brothers, as cross-complainants, asked for an accounting with Andrews and a judgment for whatever amount was found to be due. The cause was referred to the master before and after the original bill was amended. He made three separate reports and drew his conclusions upon each one. Objections were made by Andrews to all these reports, and they were overruled by the master and stood as exceptions. A decree was entered in line with the findings and recommendations of the master which found in favor of Vlahos and the cross-complainants, Pappas brothers.

The Pappas brothers in October, 1926, resided in Princeton and were unnaturalized aliens, owning the property in question. They had failed to pass the tests precedent to naturalization and believed they were in imminent danger of having their property forfeited to the State by virtue of the alien property laws of Illinois. To prevent this loss, the brothers cast about for some one to take the title to the property in trust for them and finally settled upon Andrews. One Jacobs, of Mendota, drew up the alleged trust agreement which was signed by the two brothers and Andrews. By this agreement the Pappas brothers were to sell the property to Andrews for $15,000, subject to re-conveyance whenever one or both of the brothers became naturalized. The brothers were to stand every expense in and about the trust and it was to be kept an inviolate secret between the parties. Contemporaneously with the agreement the brothers,

by warranty deed, conveyed the property to Andrews for a stated consideration of $20,000, which was evidenced by the payment to the brothers of $5000 by Andrews. This money had been placed in Andrews' hands by the Pappas brothers for that specific purpose. The $15,000 balance was evidenced by a series of notes secured by a trust deed on the property, all executed by Andrews. All leases and insurance policies were assigned to Andrews by the brothers and they also attorned to him as the landlord, for they continued to occupy a portion of the premises. Andrews actually went into possession of the property, collected the rents and kept up the insurance and repairs on the building. The brothers paid rent to him, and Andrews paid the net avails of the property from time to time to the bank, in reduction of the $15,000 debt. The notes for this $15,000 had been placed in the bank by the Pappas brothers to secure an existing indebtedness of their own to the bank.

Andrews was married in December, 1930, and John Pappas went to him in an endeavor to obtain a re-conveyance of the property. Andrews refused to re-convey, claiming the property as his own. In March, 1931, the brothers conveyed the property to Vlahos by warranty deed for $30,000, the grantee at the time being fully acquainted with the disputed state of the title. No money passed in this transaction, but three promissory notes were given by Vlahos, secured by a mortgage on the property. The notes and mortgage were placed in escrow with the bank which also held the Andrews notes as collateral, until the brothers had cleared the title to the property under their agreement to do so. In April, 1931, Andrews and wife mortgaged the property to his brother to secure a note for nearly $6500. The master found that the local bank holding the Andrews and Vlahos notes was willing to cancel the notes of Andrews, free him from all liability thereon, and look only to the property for security and payment, although it took the Andrews notes without any knowledge of defenses existing, and in the ordinary course of business.

An examination of the record reveals a serious discrepancy between the amended answer of Andrews and his testimony, which cannot be reconciled. In his answer Andrews denies he took title in trust but is insistent he took only as a purchaser, with intent to act as an aid in enabling the brothers to circumvent the laws of the State. No mention is made in the answer that he had executed the so-called trust agreement. When confronted at the hearing with his signature to the so-called trust agreement, Andrews had to admit its existence. He then sought to negative whatever evidentiary force it had by testifying that he regarded himself as the true owner, subject only to the right of the brothers to re-purchase in the event either, or both of them, became naturalized. In his brief and argument in this court he assumes still another position, arguing that such instrument, and the actions thereunder, cannot be availed of by the brothers as the so-called trust was void as against public policy and a fraud upon the State.

Andrews looks upon the original and amended bill to be only what the title denotes, a "Bill to set aside deed," and argues that the allegations contained therein, respecting the possession of Vlahos and the fraud on the part of Andrews, do not contain sufficient specific averments of facts. This objection would possess merit if the title of the bill limited and governed its scope but that conclusion does not follow. When we examine the prayer for relief, we find that Vlahos asks, in the main, that the alleged trust property be re-conveyed to him, while the prayer for the removal of the cloud on the title is an incidental or collateral matter, which could be accomplished by a decree in accord with the real purpose of the bill. Therefore, the allegations of possession in Vlahos do not have to meet the stringent requirements sought to be invoked against the bill, for they are inapplicable. (*Chicago Medical School* v. *Wilson*, 341 Ill. 170.) The allegations of fraud contain sufficient factual averments to support the bill. When a defendant fails to

challenge the sufficiency of the bill in the lower court, he cannot do so for the first time in a court of review. (*Lott v. Davis*, 264 Ill. 272; *Miller v. Akin*, 350 id. 186.) Since Andrews failed to challenge the sufficiency of the bills in the circuit court, he cannot do so here.

Andrews next charges that the deed he received from the Pappas brothers is illegal because it is founded upon a fraudulent agreement to defraud the State of Illinois of the opportunity to declare a forfeiture of the property under the alien land laws of the State. It is his theory that, as a consequence of this fraud, equity will leave the parties where it found them, and thus he will retain title to the property. This theory must fall for two reasons, either being sufficient without the other. In the first place an alien has the right to acquire, hold and alienate real estate, even to the extent of holding against the State, until office found. (*John v. John*, 322 Ill. 236; 1 Perry on Trusts, (6th ed.) sec. 36; *Osterman v. Baldwin*, 73 U. S. 116, 18 L. ed. 730.) The State is the only one to question the right of the alien to hold, and such right cannot be attacked in a collateral proceeding. (*Osterman v. Baldwin, supra; Manuel v. Wulff*, 152 U. S. 505, 38 L. ed. 532.) This protection of the right against collateral attack extends logically to the equitable interest of an alien as the beneficiary of a trust. (*Hayden v. Sugden*, 96 N. Y. S. 681; 1 Perry on Trusts, (6th ed.) secs. 36, 55, 64; *Osterman v. Baldwin, supra; Taylor v. Benham*, 5 How. U. S. 233, 12 L. ed. 130.) Secondly, the claim of Andrews was acquired under the trust and he is estopped to deny the possession of Pappas brothers, the beneficiaries under the trust. (*Guilfoil v. Arthur*, 158 Ill. 600.) He is further estopped to deny the trust for he was not deceived into accepting it and undertaking to perform the duties thereunder. (*Albretch v. Wolf*, 58 Ill. 186; *O'Halloran v. Fitzgerald*, 71 id. 53; *Guilfoil v. Arthur, supra.*) The trust agreement and the deed together constituted a valid trust which can be en-

forced. *McFall* v. *Kirkpatrick*, 236 Ill. 281; *Osborn* v. *Rearick*, 325 id. 529; *Marble* v. *Marble*, 304 id. 229; *Crow* v. *Crow*, 348 id. 241.

The evidence showing the reasons for the creation of the trust, the performance by Andrews of the duties imposed thereby for a number of years, his final repudiation of the trust and his attempt to claim the property as his own, is very clear and convincing. Andrews, when confronted with the trust agreement, could only admit its existence and change his position to one where he argued his right to retain the property as his own, subject to the right of Pappas brothers to have the property re-conveyed to them at the purchase price when both, or either of them, became naturalized. This stand is specious, for Andrews did not use his own money to make the initial payment of $5000 or to reduce the $15,000 debt at the bank. The notes representing this debt were reduced by the application of rent moneys received by Andrews in managing the property as trustee, not as his own property devoid of the trust. While the Pappas brothers did not reserve a power of revocation, nevertheless the trust may be revoked by them as they are the sole beneficiaries and, as such, do not need the consent of the trustee Andrews to revoke. (*Anderson* v. *Williams*, 262 Ill. 308; *Jennings* v. *Kotz*, 299 id. 465.) "If the settlor is the sole beneficiary of a trust and is not under an incapacity, he can compel the termination of the trust, although the purposes of the trust have not been accomplished." (Restatement, Trusts, sec. 339.) The trust was not only revoked by the Pappas brothers, but Andrews also repudiated it; therefore it was divested of its executory features and the operation of the Statute of Uses turned it into a use. (*Moll* v. *Gardner*, 214 Ill. 248; *Jennings* v. *Kotz, supra; Reichert* v. *Missouri and Illinois Coal Co.* 231 Ill. 238; Restatement, Trusts, sec. 696.) The chancellor did not err in decreeing a re-conveyance of the property.

We shall now consider that phase of the case where Pappas brothers were cross-complainants and Andrews the defendant, involving money and stock transactions between them. Prior to May 11, 1928, John T. Pappas, acting for Pappas brothers, carried an account with a brokerage house in Chicago whereby he dealt in stocks on "margin." The stocks in this account belonged to Pappas and Andrews, both putting in money from time to time to carry the account. On that date stocks to the amount of $7,383.70 were transferred from the Pappas account to the newly created separate, individual account of Andrews, each man thereafter conducting his stock business separate from the other. On May 18, 1928, Andrews called upon Pappas for assistance in covering his margins. Pappas was without ready funds at the time but gave the brokerage house a written guarantee of Andrews' account, and their separate trading ventures continued. In June or July, 1930, the stock market had been falling and Andrews needed $3545.35 to balance his account. The brokerage house transferred this amount from the account of Pappas to that of Andrews, as a result of the guaranty given by Pappas, and the Andrews account was then closed. Pappas requested payment of this $3545.35 from Andrews, which was refused. Suit to collect followed and, by stipulation, it was consolidated with the equity action. The master found that Andrews owed Pappas $3545.35 and recommended the entry of a decree for that amount, which was done. Andrews in defense made several contentions; first, that he never had an account with the brokerage house as a matter of fact, but that Pappas had such an account and later opened another one under Andrews' name. This contention is not substantiated by the evidence in the record. Andrews next argues that the transaction was void because it constituted gambling on the stock exchange. In support of this argument he cites a number of authorities, together with certain sections of an act of the General Assembly

relating to bucket shops. (Smith's Stat. 1933, chap. 38, pars. 328, 329.) Neither the statute, nor the cases cited, are applicable to the situation here presented, either from a factual or legal standpoint.

Andrews also charges that the Pappas guarantee was purely a voluntary one. This is predicated upon the false assumption that Pappas was using Andrews' name to carry a second account. The master correctly interpreted the testimony upon this item when he held the account standing in Andrews' name really was the account of Andrews.

Complaint is made of the failure of the chancellor to order a full accounting between Andrews and the Pappas brothers, the former alleging that it would show the Pappas brothers owed him $6003.90. The brothers do not deny that at one time they owed this amount to Andrews but the evidence is clear that they paid to Andrews more than enough to discharge this obligation. The testimony of Andrews concerning the supposed obligations of Pappas brothers was not believed by the master or chancellor and no proof appears in the record to disprove their conclusions that the Pappas brothers had paid Andrews all they owed him.

The record contains over a thousand pages and we have referred to it in checking over the testimony of the Pappas brothers and of Andrews. Comparison of their stories reveals candor on the part of the brothers and a lack of it on the part of Andrews. The master, had the principals before him for some time and was far better able than we to form an accurate opinion as to which were giving a truthful recital of their business relations. We see no reason to disturb what the master has determined and the chancellor has approved. The decree was in full accord with the evidence and the equitable principles involved.

The decree is affirmed.

*Decree affirmed.*