**ILLINOIS CENTRAL RAILROAD COMPANY, Monon Railroad and St. Louis Southwestern Ry., Plaintiff and Intervening Plaintiffs,**

v.

**UNITED STATES of America, Interstate Commerce Commission, Missouri Pacific Railroad Company, Chicago & Eastern Illinois Railroad, Louisville and Nashville Railroad Company and Leon Leighton, Defendants and Intervening Defendants.**

No. 65 C 1393.

United States District Court
N. D. Illinois, E. D.

Aug. 4, 1966.

Judgment Affirmed Jan. 9, 1967.
See 87 S.Ct. 612.

William J. O'Brien, Jr., Chicago, Ill., for Illinois Central R. R.

Fritz R. Kahn, Washington, D. C., for Interstate Commerce Commission.

Edward V. Hanrahan, U. S. Atty., Chicago, Ill., Thurgood Marshall, Sol. Gen., Washington, D. C., for the United States.

James W. Hoeland, Lousiville, Ky., Harry R. Begley, Chicago, Ill., for Louisville & Nashville R. R.

Leon Leighton, New York City, pro se.

Albert E. Jenner, Jr., Thomas P. Sullivan and John C. Tucker, Chicago, Ill., William R. McDowell, Dallas, Tex., M. M. Hennelly and Gilbert P. Strelinger, St. Louis, Mo., Donald J. O'Brien, Jr., Chicago, Ill., for Missouri Pacific R. R.

John B. Goodrich, James H. Hawk, Robert Thorsen, Chicago, Ill., for Monon R. R.

W. McNeil Kennedy and Herbert S. Wander, Chicago, Ill., for Chicago & Eastern Illinois R. R.

Nuel D. Belnap, Richard M. Freeman and Daniel J. Sweeney, Chicago, Ill., for St. Louis Southwestern Ry.

Before SCHNACKENBERG, Circuit Judge, CAMPBELL, Chief District Judge, and DECKER, District Judge.

DECKER, District Judge.

Illinois Central Railroad ("IC") brings this suit to set aside an order of the Interstate Commerce Commission ("Commission"). Pursuant to 28 U.S.C. §§ 2284 and 2321–2325 the matter was tried before a three-judge court. The order, under § 5(2) of the Interstate Commerce Act, 49 U.S.C. § 5(2), authorized the Missouri Pacific Railroad ("MoPac") to acquire control of the Chicago & Eastern Illinois Railroad ("Eastern"), with the condition that Eastern then negotiate to sell to the Louisville & Nashville Railroad ("L&N") the Eastern Evansville line. The St. Louis Southwestern Ry. ("Cotton Belt") intervenes as a plaintiff; MoPac, Eastern and a stockholder of Eastern intervene as defendants. In addition, the Monon Railroad and L&N intervene as a plaintiff and a defendant, respectively, to argue that portion of the Commission's order

dealing with the sale of the Evansville line.

Eastern is a comparatively short, bridge and terminal railroad running south from Chicago to East St. Louis and Thebes, Illinois, on the west, and to Evansville, Indiana, on the east. On a map its routes roughly resemble an inverted letter "Y." Its lines are in an "end-to-end" relationship with the lines of MoPac and L&N, neither of which now has access to the Chicago gateway over its own track. Eastern's lines are in a "side-by-side" relationship with the lines of IC, and if Eastern's lines are included in the MoPac and L&N systems, these two large railroads can for the first time compete with IC for substantial long line traffic over tracks entirely controlled by them.

In 1962, when the record in this case was made before a hearing examiner, Eastern was in serious financial difficulty. The examiner found that "practically every principal party in the proceedings herein predicates its individual interests upon convictions that Eastern's financial position is precariously weak, and that immediate substantial assistance is imperative to protect its ability to provide adequate transportation service."[1] The Commission found that control of Eastern by a major long-line railroad which had an interest in preservation of Eastern and modernization of its facilities would be in the public interest. Eastern's future as well as the interests of shippers and the development of a sound national transportation system were found to be better served by an "end-to-end" affiliation with MoPac than by a "side-by-side" affiliation with IC, one of Eastern's competitors.

Although these proceedings concerned authority to gain control, MoPac had already acquired substantial quantities of Eastern securities when the control application was filed in 1961. At the time of the 1962 hearing, the examiner found that MoPac and its parent corporation, Mississippi River Fuel Corp.,

---

1. Excerpts from Examiner's Report, p. 58.

were beneficial owners of the following proportions of Eastern securities: 17.2% of the common stock, 31.42% of the class A stock and 8.29% of the Convertible 5% General Mortgage Income Bonds.[2] Approval by two-thirds of the class A stock voted at a meeting was required for certain Eastern corporate actions (e. g., mergers, certain leases and certain sales of assets). Since less than 90% of that stock was voted at the typical Eastern meeting, MoPac had sufficient holdings to prevent the needed two-thirds majority support, and thereby veto proposed action.

Eight months after the major acquisition of Eastern securities, MoPac established an "Independent Voting Trust" into which all of the securities were placed, with instructions that "the trustee shall vote the securities of C&EI so that at all times * * * there shall, to the best of its knowledge, be entire independence of directors and management between MoPac and C&EI." Subsequent to the examiner's hearing, on February 20, 1964, MoPac acquired additional Eastern securities which were conveyed immediately to the trustee.

The Commission held that MoPac had illegally acquired some measure of control of Eastern by purchasing the class A stock and the veto power it carried without first obtaining Commission approval. Control of one railroad by another without Commission permission under § 5(2) is a violation of § 5(4) of the Interstate Commerce Act, 49 U.S.C. § 5(4); a common remedy is denial of the offending carrier's § 5(2) control application. However, MoPac's violation was held to have been comparatively minor and to have terminated upon creation of the trust eight months after the securities were acquired. The Commission held that control need not be denied in this case simply because of a § 5(4) violation in light of the great public

benefit flowing from MoPac control of Eastern.

IC labels MoPac's § 5(4) violation flagrant rather than minor, and argues that the Commission made an error of law when it found the trust effective to insulate Eastern from MoPac control. IC claims that a proper evaluation of the seriousness of MoPac's violation in light of the legal inefficacy of the trust requires strict enforcement of § 5(4) and denial of MoPac's § 5(2) control application. While IC challenges the findings that shippers and the national transportation system will be served best by MoPac control, the primary thrust of the complaint is that the Commission acted arbitrarily on the basis of a mistake of law in holding MoPac's § 5(4) violation so trivial that the public interest required an award of control to MoPac rather than divestiture.

IC further argues that the Commission acted arbitrarily in refusing to reopen the record to receive evidence on two points: 1) alleged further MoPac § 5(4) violations; 2) Eastern's substantially improved financial condition since the 1962 hearing. IC claims that this case must, at the very least, be remanded to the Commission for further consideration in light of this proffered evidence.

Finally, the provision in the order for compulsory negotiations between Eastern and L&N for sale of the Evansville line is said to be beyond the Commission's legal power to enter.

We hold that the Commission did not err in finding the trust effective, that it did not clearly abuse its discretion in denying the petitions to reopen the record, that its provision for negotiations for sale of the Evansville line was legal, and that there is substantial evidence in the record in support of the Commission's findings. Therefore, we affirm the order of the Commission.

---

**2.** Hereafter holdings of MoPac and its parent are referred to as holdings of MoPac alone.

## I.

This case requires resolution of the conflict between §§ 5(2) and 5(4)[3] of the Interstate Commerce Act which arises whenever an applicant seeks authority to acquire control of a railroad in a situation where the applicant has already acquired some measure of control without prior Commission approval. While § 5(2) directs Commission approval of a proposed control transaction if it will be "consistent with the public interest," § 5(4) declares it unlawful to enter into such a transaction without § 5(2) approval. Denial of a § 5(2) application because of a § 5(4) violation may deprive the public of important transportation benefits; approval of a § 5(4) *fait accompli* rewards the lawbreaker. The Commission is not a stranger to this dilemma.

■ The Commission weighs a § 5(4) violation when it determines whether a control transaction will be in the public interest. In its leading case on this question, the Commission said:

"The public interest is concerned not only with improvements in transportation service, but also with the maintenance of respect for and the observance of the law. If the Frisco is permitted to retain the fruits of its unlawful conduct, and we sanction such conduct, which we consider to have been in flagrant disregard of the law, others will be encouraged to pursue a like course and to present a *fait accompli* for our approval. Obviously, such is not in accord with the intent of the statute; i. e., that we pass upon 'proposed' acquisitions of control prior

to their consummation, including the justness and reasonableness of the terms upon which such control is to be acquired. If the indicated practice were generally followed, our administration of the statute in the public interest would be seriously hindered, if not defeated." Central of Georgia Railway Co. Control, 307 ICC 39, 43–44 (1958).

See also, Gilbertville Trucking Co. v. United States, 371 U.S. 115, 128–129, 83 S.Ct. 217, 9 L.Ed.2d 177 (1962). Where the statutory violation is flagrant, in open defiance of Commission authority, the public interest may require denial of a § 5(2) application. See e. g., Central of Georgia Railway Co. Control, 307 ICC 39 (1958); Buckingham Transportation Inc.—Control and Merger, 90 MCC 731, 741 (1962); Coldway Food Express, Inc. —Control and Merger, 87 MCC 123 (1961); Houff—Control, 80 MCC 637 (1959). However, where the evidence shows that the applicant acted in good faith, the public interest in strict enforcement of § 5(4) may be comparatively small. See e. g., Bringwald—Control, 90 MCC 11 (1962) (control acquired after consultation with ICC supervisor); Yellow Cab Co.—Control, 87 MCC 96 (1960) (violation of statute "resulted primarily from erroneous advice"); Gate City Transport Co.—Control, 87 MCC 591 (1961) (control acquired gradually by one truck-owner helping his ailing truck-owner friend). See also, Central of Georgia Railway Co. Control, 307 ICC 39, 45–46 (1958) (dissenting opinion).

The Commission applies a balancing test. The preference for denying control

---

3. "§ 5, par. (4). *Control effected by other than prescribed methods.* It shall be unlawful for any person, except as provided in paragraph (2) of this section, to enter into any transaction within the scope of subdivision (a) of paragraph (2) of this section, or to accomplish or effectuate, or to participate in accomplishing or effectuating, the control or management in a common interest of any two or more carriers, however such result is attained, whether directly or indirectly, by use of common directors, officers, or stockholders, a holding or investment company or companies, a voting trust or trusts, or in any other manner whatsoever. It shall be unlawful to continue to maintain control or management accomplished or effectuated after the enactment of this amendatory paragraph and in violation of its provisions. As used in this paragraph and paragraph (5) of this section, the words 'control or management' shall be construed to include the power to exercise control or management."

to violators of § 5(4) "will give way to a clear showing of public interest in approval." Gilbertville Trucking Co. v. United States, 371 U.S. 115, 129, 83 S.Ct. 217, 225, 9 L.Ed.2d 177 (1962); Central of Georgia Railway Co. Control, 307 ICC 39 (1958). Compare Buckingham Transportation Inc.—Control and Merger, 90 MCC 731 (1962), with DeBardeleben Marine Corp.—Control, 312 ICC 69 (1960). Thus, a mere similarity in the degree of flagrancy of a violation between cases does not dispose of the problem since the public benefits of control may be greater in one case than in another.

■ The Commission minimized MoPac's § 5(4) violation and maximized the public benefit flowing from MoPac control of Eastern:

> "The record makes it abundantly evident that, except for the limited veto power it possessed through its holdings of the class A stock, Missouri Pacific did not otherwise have power to control Eastern, and that it did not exert any apparent influence on Eastern's management, prior to or after the creation of the voting trust." [4]

There is sufficient evidence in the record to support these conclusions. While neither the negative character of the control nor MoPac's self-imposed restraint are relevant in determining whether § 5(4) was violated, both factors may properly be considered in evaluating the flagrancy of the violation. The Commission considered them to be mitigating factors here.

■ Important to the Commission's conclusion that MoPac was not a flagrant violator of the law was the finding that the § 5(4) violation was *temporary*. The Commission was impressed by MoPac's conveyance of Eastern securities to the Marine Midland "independent voting trust." MoPac's purpose in creating the trust is recited in the trust agreement, as follows:

> "MoPac, without admitting that its purchases and ownership of shares of

the capital stock of [Eastern] constitute control of, or power to control, said Company, wishes to avoid any questions or charges that have or may arise by reason of its ownership of such [Eastern] stocks; and to that end desires to place in trust any shares of capital stock issued by [Eastern] and purchased or otherwise acquired by MoPac, so that MoPac shall not be enabled, until such time as control by it of [Eastern] may be authorized in accordance with applicable provisions of law, to exercise any voting rights incident to any stocks of [Eastern] now owned or hereafter acquired by it."

The agreement requires the trustee to vote the Eastern securities independently, as follows:

> "The Trustee shall vote the securities of [Eastern] so that at all times during the continuance of this Trust Agreement there shall, to the best of its knowledge, be entire independence of directors and management between MoPac and [Eastern], and the Trustee shall not exercise the voting power of said securities of [Eastern] in such way as to its knowledge cause any dependence or intercorporate relationship between said two companies."

The drafters of the agreement attempted to create an irrevocable trust. The Commission described the revocation provisions of the trust, as follows:

> "The trust, during its term, is irrevocable, and is to remain effective until the occurrence of events specified therein, but none other. The stated events are (1) a sale of all the deposited securities (sales may be made only to persons not affiliated with Missouri Pacific), (2) the delivery to the trustee of an order of this Commission authorizing Missouri Pacific to acquire control of Eastern or to purchase any of its properties, or authorizing the release of the securities for

---

4. Commission opinion, p. 53.

any reason, or (3) passage of 10 years (ending April 20, 1972)." [5] L&N used a similar trust for its substantial holdings of Eastern securities.

IC, agreeing that the trust agreement asserts irrevocability, argues that the trust was in fact and law revocable at MoPac's will. According to IC, MoPac had only to notify the trustee that the trust was to end and the full power to control Eastern residing in the class A stock would immediately revert to MoPac's hands. Since the power to revoke the trust is the power to obtain control of Eastern, IC claims that MoPac's § 5(4) violation never ceased and continues to this day.

Inasmuch as MoPac is settlor and sole beneficiary, this trust would normally come within the general rule summarized in the Restatement (Second), Trusts § 339, and followed in numerous cases:

> "If the settlor is the sole beneficiary of a trust and is not under an incapacity, he can compel the termination of the trust, although the purposes of the trust have not been accomplished."

See Restatement (Second), Trusts, Appendix § 339; Bogert, Trusts § 1004; 3 Scott, Trusts § 339. See e. g., Universal Carloading & Distributing Co. v. Railroad Retirement Board, 84 U.S.App.D.C. 188, 172 F.2d 22, 26 (1948); Moore v. First National Bank & Trust Co. of Macon, 218 Ga. 798, 130 S.E.2d 718, 721–722 (1963); Bixby v. California Trust Co., 33 Cal.2d 495, 202 P.2d 1018, 1019 (1949); Vlahos v. Andrews, 362 Ill. 593, 1 N.E.2d 59 (1936). See also, § 23, New York Personal Property Law, McKinney's Consol.Laws, c. 41 (1909, as amended 1951); Robinson v. New York Life Insurance & Trust Co., 75 Misc. 361, 133 N.Y.S. 257, 262 (1911); but see In re Mordecai's Trust, 24 Misc.2d 668, 201 N.Y.S.2d 899, aff'd 12 A.D.2d 449, 210 N.Y.S.2d 478 (1960).

Defendants concede that this is the general rule, but they argue that "this maxim is not applicable * * * to a commercial trust designed to achieve a specific business purpose, particularly where other persons or entities have an interest in having the purpose fulfilled." The Commission and the public are said to have a "direct interest in having the purpose and terms of the trust carried out." Substantial reliance is placed on Hearst v. American Newspapers, 51 F. Supp. 171 (D.Del.1943), where the settlor and sole beneficiary of a trust was not permitted to terminate his trust under extraordinary circumstances. IC, in response, relies on H. M. Byllesby & Co. v. Doriot, 25 Del.Ch. 46, 12 A.2d 603 (1940), in support of the general rule favoring revocability.

The trust was created on April 20, 1962; the Commission was notified of it in a petition for leave to amend MoPac's § 5(2) application on April 23, 1962. In effect, the Commission was asked to rely on the terms of the trust to absolve MoPac of any § 5(4) violation based on ownership of Eastern securities, and to find that the public interest was not endangered by MoPac's holdings. It may well be that having asserted irrevocability to the Commission to protect itself, MoPac was estopped from changing its position and asserting elsewhere that the trust was revocable. Compare Hearst v. American Newspapers, 51 F.Supp. 171 (D.Del.1943). Under the circumstances of this case, the trust might be considered irrevocable.

This debate on the revocability of trusts has little to do with this case. As a matter of law, this trust could be declared legally revocable without resolving the important trust question before this court. That question, in plain terms is whether the "independent voting trust" effectively insulated Eastern from MoPac control. This is a question address-

---

5. Commission opinion, pp. 53–54. The Commission did not adopt this assertion of irrevocability at this point in its opinion as a correct or controlling rule of law; the Commission was simply reviewing what the trust agreement said on its face. This was a passage of description, not judgment.

ed more to the realities of the railroad business than the niceties of trust law.

The Commission was primarily concerned with *effectiveness*. The following findings were made:

" * * * the transfer of legal title to the unlawfully acquired stock and securities of the Chicago & Eastern Illinois Railroad Company to The Marine Midland Trust Company of New York as trustee effectively divested the Missouri Pacific Railroad Company and the Mississippi River Fuel Corporation of the power to control or manage the Chicago & Eastern Illinois Railroad Company and thereby terminated the violation; and * * * the holding of legal title to stock and securities of the Chicago & Eastern Illinois Railroad Company by The Marine Midland Trust Company of New York and The Bank of New York as trustees, respectively, for the Missouri Pacific Railroad Company and the Louisville and Nashville Railroad Company in accordance with the provisions of the trust agreements approved herein for each, effectively insulated the Missouri Pacific Railroad Company and Mississippi River Fuel Corporation, and the Louisville and Nashville Railroad Company from the control or power to control the Chicago & Eastern Illinois Railroad Company." [6]

The trust, along with other self-imposed restraining measures, was found to be "successful to the extent that none of the acquired power to control the affairs of Eastern was actually, or could be, exercised" by MoPac. The Commission further stated:

"Also warranted are findings that the trustees named by Missouri Pacific and [L&N] were and are qualified to undertake the fiduciary positions involved and have faithfully carried out the terms of their respective trust agreements in such a way as to successfully insulate Missouri Pacific and [L&N], individually and together, from the power to control Eastern, and that neither Missouri Pacific nor [L&N] have acquired control of Eastern through the trusts or otherwise, except for the instance already noted." [7]

This is the language of reality and practicality. The Commission focused on the *success* and *effectiveness* of the trust. When the Commission held that "the violation ceased upon the effectuation of the trust" and that "from and after the time the trust arrangement was put into effect, Missouri Pacific has had neither control nor power to control the affairs of Eastern," the Commission was concluding that § 5(4) was no longer offended once the trust was created. The Commission's opinion contains no indication that the *legal* irrevocability of the "independent voting trust" was critical to the conclusion that the trust was effective for purposes of § 5(4).

The question is whether it was arbitrary, or a mistake of law, for the Commission to conclude that the "independent voting trust" was sufficient to effectively avoid a § 5(4) violation by MoPac. We think the Commission correctly approved this trust, regardless of the technical rules of the law of trusts.

The power of the Commission to respond to conditions of illegal control is practically plenary under the Interstate Commerce Act. The Commission has the power to initiate an investigation, 49 U.S.C. § 5(7), order termination of a violation, 49 U.S.C. § 5(7), seek an injunction in a United States District Court, 49 U.S.C. § 5(8), and refuse approval of a *fait accompli*, 49 U.S.C. § 5(2), Gilbertville Trucking Co. v. United States, 371 U.S. 115, 83 S.Ct. 217, 9 L. Ed.2d 177 (1962). Of particular importance here, the Commission is charged with the task of measuring the moral turpitude of a carrier which violates § 5(4).

Were MoPac to revoke this trust, the Commission could deal swiftly with the condition of illegal control. The power thus obtained would be evanescent. A

---

6. Commission opinion, pp. 61–62.

7. Commission opinion, p. 57.

MoPac revocation would endanger the very goal MoPac seeks: control of Eastern. It is beyond reasonable comprehension to suppose that MoPac would revoke this trust prior to gaining Commission approval. The court can imagine no credible hypothesis upon which the possibility of MoPac revocation can be based, and IC has provided us with none.

For the purposes of § 5(4), this practical barrier to revocation is sufficient. It amounts to irrevocability. Whether or not this trust could be revoked at MoPac's will, the complete answer for purposes of the Interstate Commerce Act is that it would not be revoked. This holding in no way subverts the purpose of § 5(4). Congress created a statutory scheme to reach the elaborate corporate devices used to centralize control over railroads without Commission supervision. Gilbertville Trucking Co. v. United States, 371 U.S. 115, 124, 83 S.Ct. 217, 9 L.Ed.2d 177 (1962). Temporary control of Eastern by a trustee charged with the specific duty of independent action is not of itself the first step on the road to centralized control of railroads. The use of a trust of this type with an independent trustee *pending* Commission approval of a control arrangement is the antithesis of effecting control without Commission supervision.

Cotton Belt argues that no other railroad "would be likely, as a practical matter, to even consider spending time and money on merger negotiations and studies as long as the MoPac held out the veto power (whether in its own hands or in that of its trustee) found by the Commission." However, as long as the trustee is in fact independent and therefore free to vote its stock in favor of an arrangement with a railroad other than MoPac, Cotton Belt's argument is insufficient to raise a § 5(4) problem. The Commission found on the basis of substantial evidence that the trustee was qualified to carry out its contractual duty of independence and had done so. We cannot overturn that finding.

We hold that the Commission properly found the MoPac "independent voting trust" to be effective insulation between MoPac and Eastern. This finding is neither arbitrary nor in conflict with the law. In this situation, the extent of MoPac's § 5(4) violation is a matter depending on events prior to the creation of the trust. In light of the efficacy of the trust, the Commission was justified in considering as a mitigating circumstance the fact that the § 5(4) violation was temporary.

The Commission was also justified in finding evidence of good faith in the particular way in which MoPac established the trust. The Commission made the following observation:

"The trust agreement was drafted in terms obviously designed to meet the requirements for independent voting trusts heretofore approved and/or prescribed by the Commission in a number of proceedings involving the question of one carrier's control of another where the object of the trust was to bar the beneficial owner of the securities from participation in the control, management and operation of the issuing carrier. See Interstate Commerce Commission v. Baltimore & O. R. Co., 183 I.C.C. 165, Wabash R. Co. Control, 247 I.C.C. 365 and New York, C. & St. L. R. Co. Control, 295 I.C.C. 703." [8]

The Commission was correct in saying that "unlike the flagrant disregard for the law which characterized the situation in Central of Georgia Ry. Co. Control, 307 I.C.C. 39 (1958), there are in the present record a number of factors mitigating the unlawful conduct." However, even if MoPac's behavior was as reprehensible as the behavior condemned in the *Central of Georgia* case, denial of MoPac's control application would not necessarily be required. The Commission balances the public interests voiced in both §§ 5(2) and 5(4); the magnitude of the public benefit flowing from a particular control arrangement has

---

8. Commission opinion, p. 54.

some impact on the response to a § 5(4) violation. It is this question of public benefit to which we now turn.

## II.

▮▮▮ The Commission said:

"In our opinion, the public interest considerations in these proceedings overwhelmingly favor approval of Missouri Pacific's control of Eastern subject to conditions for inclusion of [L&N] notwithstanding the section 5 (4) violation." [9]

The function of this court in reviewing this determination of the Commission is sharply restricted. "It is limited to ascertaining whether there is warrant in the law and the facts for what the Commission has done." United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 536, 66 S.Ct. 687, 698, 90 L.Ed. 821 (1946); 5 U.S.C. § 1009(e). "The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 694, 78 L.Ed. 1260 (1934). Once this court finds substantial evidence in support of the Commission's findings, it cannot go further and inquire into the soundness of the Commission's reasoning or the wisdom of the result. Virginian Ry. v. United States, 272 U.S. 658, 663, 47 S.Ct. 222, 71 L.Ed. 463 (1926); United States v. New River Co., 265 U.S. 533, 542, 44 S.Ct. 610, 68 L.Ed. 1165 (1924).

▮▮▮ The Commission found that an "end-to-end" affiliation with MoPac would lead to modernization and substantial improvement in Eastern's physical plant and its ability to serve shippers and other connecting railroads. In contrast, the Commission found that "side-by-side" affiliation with IC, one of Eastern's competitors, would lead to Eastern's "eventual subjugation and disintegration * * * or its continued operation as a self-restricted, financially weak system as at present." These find-

ings are fully supported by the evidence in this case.

The finding that the MoPac control arrangement would provide substantial new service for large numbers of shippers in the southeast and southwest without significant injury to competing carriers is also supported by substantial evidence in the record. In particular, the testimony of numerous shippers, municipalities and others in support of MoPac control of Eastern is convincing support for the Commission's conclusion.

We find no support for IC's contention that MoPac control, rather than IC control, is subversive of the national transportation policy. Great emphasis must be placed on obtaining an adequate, efficient and economical system of transportation, as IC argues, but IC has not shown that the Commission erred in concluding that MoPac control of Eastern would best effectuate that policy. We find substantial evidence in support of the conclusion that MoPac control is the clearly preferable future status for Eastern.

In light of the support in the record for these findings, we cannot say that the Commission improperly struck the balance between the requirements of §§ 5(2) and 5(4). The Commission's result is not arbitrary or in violation of the law, and therefore it must be affirmed.

## III.

MoPac did not terminate its transactions in Eastern securities upon creation of the "independent voting trust." Following the 1962 hearing by the examiner, further Eastern securities were acquired by MoPac and two investment firms with which it did business. Dissenting Commissioner Tucker, and the IC, argue that the Commission clearly abused its discretion when it refused to reopen the record to receive evidence of these later purchases.

IC offered evidence of these new acquisitions in a petition to reopen the rec-

---

**9.** Commission opinion, p. 58.

ord filed on August 20, 1964, seven months before the Commission decided this case. Substantially the same facts were set forth in a similar petition filed by the Commission's Bureau of Inquiry and Compliance on August 31, 1964. It is clear from MoPac's reply on September 2, 1964, and IC's response to that reply on September 6, 1964, that the central facts of the additional transactions are not in dispute.

On November 22, 1963, MoPac entered into an option agreement with Eastman Dillon, Union Securities & Co. to purchase $3,000,000 of Eastern Convertible 5% General Mortgage Income Bonds already owned by Eastman Dillon. On December 17, 1962, MoPac entered into an option agreement under which Dempsey-Tegeler & Co. purchased $1,000,000 of Eastern's convertible bonds for ultimate sale to MoPac. Both options were exercised by MoPac on February 20, 1964, and the bonds were immediately transferred to MoPac's "independent voting trust," together with another $878,000 worth of bonds purchased from Dempsey-Tegeler on the same date which were not covered by the original option agreement. The Commission was notified of both the option agreements and the $4,878,000 in purchases on February 24, 1964.

At times during the year before IC filed its petition, Eastman Dillon and Dempsey-Tegeler held for their own accounts a total of 59,900 shares of Eastern common stock. IC charges that these holdings by MoPac's "long-term investment banking associates"—the Bureau of Inquiry and Compliance called them "friendly brokers"—must be included in MoPac's total interest in Eastern.

IC adds these bonds and shares of stock to those purchased by MoPac in 1961 (and presently held in trust), converts all of MoPac's convertible bonds into common stock (but no other outstanding convertible bonds), and concludes that MoPac has acquired "mathematical" power to control Eastern by ac- quiring the power to obtain more than 50% of Eastern's outstanding common stock. IC claims that such a startling maneuver requires reopening of the record, particularly in light of the Commission's finding that MoPac was guilty of only a minor infraction of § 5(4).

When it refused to reopen the record in its order of February 16, 1965, the Commission had before it all of the facts set forth in the petitions and the replies. The Commission was entitled to consider these facts and their potential impact on the merits of the case. United States v. Pierce Auto Freight Lines, 327 U.S. 515, 535–536, 66 S.Ct. 687, 90 L.Ed. 821 (1946). After finding that the "independent voting trust" was effective for the purposes of § 5(4) and that MoPac had refrained from attempting to influence Eastern's affairs, the Commission ruled, as follows:

> "These findings render moot the issues raised in the petitions filed by Illinois Central and the Bureau wherein further hearing is sought for the purpose of establishing that, by its trustee's acquisition of additional of Eastern's stock and convertible bonds subsequent to the hearing, Missouri Pacific and persons associated with it have acquired the power to control Eastern." [10]

Petitions for reopening and rehearing are addressed to the Commission's discretion. "Only a showing of the clearest abuse of discretion could sustain an exception to that rule." United States v. Pierce Auto Freight Lines, 327 U.S. 515, 535, 66 S.Ct. 687, 697, 90 L.Ed. 821 (1946). The Supreme Court has ordered reopening in only one case: Atchison, T. & S. F. R. Co. v. United States, 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273 (1932), where the Great Depression had intervened between the hearing and the order. But that case was "promptly restricted * * * to its special facts * * * and it stands virtually alone." Interstate Commerce Commission v. Jersey City, 322 U.S. 503,

10. Commission opinion, p. 57.

515, 64 S.Ct. 1129, 1135, 88 L.Ed. 1420 (1944). Accord, United States v. Northern Pacific Ry. Co., 288 U.S. 490, 53 S.Ct. 406, 77 L.Ed. 914 (1933); Baltimore & Ohio R. Co. v. United States, 298 U.S. 349, 389, 56 S.Ct. 797, 80 L.Ed. 1209 (1936) (concurring opinion of Mr. Justice Brandeis). IC cites only one case in which reopening was required in reliance on *Atchison.* That case is State of Oklahoma, by and Through Corp. Comm. v. United States 193 F.Supp. 261 (W.D.Okla.1960), decided by a divided three-judge court, which is clearly distinguishable from the present case. In contrast, numerous cases have followed the strict rule of *Jersey City,* supra, *Pierce Auto,* supra and *Northern Pacific,* supra.

■ The question is whether the Commission was guilty of "the clearest abuse of discretion" when it denied the petitions to reopen to receive evidence of new MoPac Transactions in Eastern securities. We hold that the Commission did not abuse its discretion. Once the effectiveness of the "independent voting trust" was established, it was not an abuse of discretion to find that evidence of subsequent purchases which were immediately poured into the trust would have no impact on the result in the case. If the trust was sufficient to terminate the prior § 5(4) violation, the Commission could reasonably find that no new violation could have resulted from the purchase of additional securities for that trust.

If the potential voting power of the newly acquired bonds in trust is deducted from MoPac's alleged new voting strength, the Commission could reasonably find that evidence of the small common stock holdings of Eastman Dillon and Dempsey-Tegeler would have no impact on the merits of the case. Even if charged to MoPac, these holdings would be insufficient to amount to the control required to violate § 5(4). Furthermore, the petitions do not contain sufficient allegations to justify a hearing on possible MoPac control deriving from these holdings by others.

■ Although use of the trust on February 20, 1964, may reasonably be found to have been sufficient to circumvent additional § 5(4) violations, events occurring prior to use of the trust are not protected in the same way. It appears that MoPac had access to the bonds purchased by Eastman Dillon and Dempsey-Tegeler pursuant to the option agreements *prior* to MoPac's purchase of those bonds on February 20, 1964. Whatever power to control Eastern resided in those convertible bonds must be charged to MoPac for the period just prior to that date.

The November 22, 1963, agreement with Eastman Dillon obligated MoPac to "purchase at any time within two years from the date hereof, $3,000,000 principal amount" of Eastern bonds already owned by that firm. Eastman Dillon could require MoPac to purchase some bonds "from time to time." A single barrier was erected to purchase at MoPac's will: the agreement was inoperative if "MoPac shall in its opinion be legally unauthorized to make such purchase." We do not find MoPac's legal opinion sufficient insulation between MoPac and the power inherent in the bonds held by Eastman Dillon. Consequently, from November 22, 1963, until February 20, 1964, the potential control of Eastern which those bonds represented must be charged to MoPac.

The same result is required with respect to the Dempsey-Tegeler bonds for a different reason. The agreement explicitly provided that the Eastern bonds were to be held by Dempsey-Tegeler "until such time as Missouri Pacific shall receive final and effective authority from the Interstate Commerce Commission to control" Eastern. Despite this clear injunction, MoPac purchased these bonds on February 20, 1964, even though the Commission's final and effective authority had not been granted. It appears that the agreement's shield between MoPac and the bonds was a mere gossamer with no binding effect; there was no reliable insulation between MoPac and the power inherent in the bonds.

Therefore, that power must be charged to MoPac, for the period from the date of purchase by Dempsey-Tegeler until February 20, 1964.

Consequently, at some time shortly before February 20, 1964, MoPac had the power to obtain and convert no more than $4,878,000 of Eastern convertible bonds. Assuming conversion by MoPac and no other conversion of outstanding convertible bonds, MoPac had access to 32% of the Eastern's common stock through the bonds, and the power over Eastern's affairs associated with that much stock.

The Commission, with all of these facts before it, found that MoPac had not "acquired control of Eastern through the trusts or otherwise." In considering the petitions to reopen, the Commission was entitled to consider not only the mathematical power, if any, inherent in this quantity of stock, but also the conditions under which MoPac had access to it. While MoPac tread close to the line of another § 5(4) violation, we cannot hold that the Commission clearly abused its discretion in finding no sufficient new § 5(4) violation raised by the facts stated in the petitions. Although we may disagree with this ruling, our scope of review is limited to determining whether there is warrant in the law and facts for the result reached. United States v. Pierce Auto Freight Lines, 327 U.S. 515, 536, 66 S.Ct. 687, 90 L.Ed. 821 (1946). We hold that there is. The Commission's order of June 23, 1966, denying St. Louis Southwestern Railway's petition for reopening and rehearing was not a clear abuse of discretion for the same reasons.

## IV.

The next question is whether the Commission clearly abused its discretion in denying the petition to reopen to receive evidence of improvement in Eastern's financial condition since the 1962 hearing. The examiner's recommendation and the Commission's decision in this case were based largely on 1961 data which showed Eastern's condition to be "precarious." It is beyond question that the Commission considered Eastern's need for immediate financial rescue to be a determining factor in this case.

"Of paramount importance in these deliberations is the impact our decision will have upon the public interest. A denial of the applications herein, on whatever ground, would leave Eastern independent, as a relatively small, financially weak, and physically deficient railroad lacking the reserve and source of ready assistance needed to successfully compete with the relatively large, well-equipped, vigorous, long-line railroads operating in the same territory, and with the increasingly dynamic carriers of the other modes of transportation.

"The need, in present day railroading, for high-speed and heavy-duty facilities, for expeditious and direct long-line transport, for specialized equipment and tailor-made service, and for the other qualities demanded by a shipping public engaged in the keen competition which marks our national economy, makes it essential that Eastern have access to revitalizing resources outside of itself, if it is to survive as a positive and contributing element of the national transportation system. To deny Eastern the relief and assistance offered through the several proposals now before us, would leave it foundering and of diminishing value to either the public generally or to its own security holders. Twice since the turn of the century Eastern has had to be rescued from bankruptcy by a reorganization—in 1922 and again in 1941; and now, in these proceedings we have the opportunity to approve remedial proposals capable of preventing a recurrence, at least in the foreseeable future.

"Eastern's preservation as a prosperous competitive rail carrier under the control of Missouri Pacific and its corporate parent, Mississippi Fuel, is clearly in the public interest—certainly far more so than would be its

eventual subjugation and disintegration under the control of Illinois Central and Illinois Industries, or its continued operation as a self-restricted, financially weak system as at present." [11]

On October 16, 1963, Chicago & North Western R. Co. ("C&NW"), an intervenor in the proceedings before the Commission, filed a "motion to reopen or to take official notice," in an effort to bring to the Commission's attention a substantial improvement in certain elements of the Eastern financial picture. Replies filed by MoPac, L&N and Dempsey-Tegeler & Co., then a holder of Eastern securities, challenged the significance of the change in conditions. The petition was denied. Since 1963, Eastern has continued to show improvement in many aspects of its operations.

■ The record is unquestionably stale. However, that fact alone is insufficient to justify an order compelling the Commission to reopen. Records in long and complex cases are inevitably outdated on the day of decision and the Commission has broad discretion to refuse to permit further delay to obtain evidence of changed conditions. Interstate Commerce Commission v. Jersey City, 322 U.S. 503, 514–515, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944). Compare Atchison, T. & S. F. R. Co. v. United States, 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273 (1932) (Great Depression, rehearing required), with United States v. Pierce Auto Freight Lines, 327 U.S. 515, 535, 66 S.Ct. 687, 90 L.Ed. 821 (1946) (World War II, rehearing denied).

■ The denial of a petition to reopen is clearly within the discretion of the Commission in a case where the offered new evidence is not likely to have an impact on the merits. The improvements in elements of Eastern's financial condition which C&NW offered to show could reasonably be found by the Commission on their face to be insufficient to signal permanent cure of the underlying, long-term financial weakness and deficiencies in equipment which were so important to the decision. Under these circumstances we cannot hold that the Commission is guilty of any clear abuse of discretion in denying the petition.[12] The Commission's order of June 23, 1966, denying St. Louis Southwestern Railway's petition for reopening and rehearing was not a clear abuse of discretion for the same reasons.

## V.

■ Finally, the legality of the Commission's order with respect to Eastern's Evansville line must be considered. The order reads as follows:

"[W]e do hereby * * * require, that Missouri Pacific, if it assumes control of Eastern, shall immediately thereupon (1) take all reasonable, necessary and appropriate steps to cause Eastern to negotiate in good faith for the sale to [L&N], of so much of Eastern's line of railroad, including branches, appurtenances and facilities as is set out in appendix C hereto, so that [L&N] would be enabled to provide service between Evansville and Chicago, including intermediate points and points on branch lines springing from Eastern's mainline between Evansville and Chicago, the negotiations to begin as soon as feasible and to be completed not later than one year after the effective date of our order herein; and (2) take such steps as are necessary to permit [L&N] to provide service between Evansville and Chicago, including intermediate points and points on branch lines, under trackage or joint use rights temporarily, pending final determination of [L&N's] acquisition proceeding.

"[L&N] is to submit for consideration of this Commission, by an appropriate application under section 5(2)

---

11. Commission opinion, pp. 58–59.

12. See United States v. Pierce Auto Freight Lines, 327 U.S. 515, 535, 66 S.Ct. 687, 90 L.Ed. 821 (1946).

of the Act, any agreement reached in the negotiations, but, if the parties are unable to arrive at mutually acceptable terms within the period set for the negotiations, that fact shall be brought to the Commission's attention with the filing of the said application; and, in either event, the Commission, pursuant to the Act, shall determine equitable, just and reasonable terms consistent with the public interest, upon which [L&N] may accomplish the acquisition of the Eastern properties set out in appendix C. We shall retain jurisdiction to reopen these proceedings upon our own motion for the purpose of insuring that negotiations are conducted in good faith by the parties." [13]

This condition on MoPac control was imposed under § 5(2) (d) of the Interstate Commerce Act, 49 U.S.C. § 5(2) (d), which reads as follows:

"(d) The Commission shall have authority in the case of a proposed transaction under this paragraph involving a railroad or railroads, as a prerequisite to its approval of the proposed transaction, to require, upon equitable terms, the inclusion of another railroad or other railroads in the territory involved, upon petition by such railroad or railroads requesting such inclusion, and upon a finding that such inclusion is consistent with the public interest."

IC argues that the Commission has in effect ordered an involuntary sale by Eastern of its Evansville line. Of course, the Commission does not have the power under § 5(2) (d), or any other provision, to compel railroads to merge or sell their property against their will. St. Joe Paper Co. v. Atlantic Coast Line R. Co., 347 U.S. 298, 305–306, 74 S.Ct. 574, 98 L.Ed. 710 (1954). The Commission has frequently recognized this limitation on its power. See e. g., Chesapeake & Ohio—Control—Baltimore & Ohio, 317 ICC 261, 290 (1962); Baltimore & Ohio R.

Co. Operation, 261 ICC 535, 544–45 (1945).

We do not read the Commission's order to force a sale of trackage by an unwilling Eastern. The sale will occur only when Eastern and L&N conclude satisfactory good faith negotiations. At the time of the contemplated sale, Eastern will be controlled by MoPac in accordance with the Commission's order, and will willingly participate in the transaction. MoPac's, and therefore Eastern's, consent must be presumed from MoPac's acquiescence in the conditions of the order. Consequently, the Commission's order with respect to the Evansville line is legal.

Intervenor Monon Railroad objects to the sufficiency of the Commission's findings on the question of the competitive effect of L&N acquisition of the Evansville line. Strictly speaking, we have before us only the question of the warrant in fact and law for the order requiring compusory negotiations. It is not likely that mere negotiations will have any competitive effect whatsoever.

The Commission appears to have decided, as it was required to do, the question of the ultimate desirability of L&N control of the Evansville line. While the findings that L&N's competitors would not be significantly injured by the proposed sale are probably sufficient under cases such as McClean Trucking Co. v. United States, 321 U.S. 67, 87–88, 64 S. Ct. 370, 88 L.Ed. 544 (1944), and are probably supported by substantial evidence, we need not decide these questions today. Monon will have ample judicial protection if and when the final L&N § 5(2) application for purchase of the Evansville line is approved by the Commission. Monon can raise its objections at that time.

For the reasons hereinabove set forth in this opinion, the order of the Commission in Finance Docket Nos. 21755, 21892 and 21980 is affirmed.

13. Commission opinion, pp. 37–38.

CAMPBELL, Chief District Judge (dissenting).

I would remand this case to the Commission for a reconsideration of Missouri Pacific's § 5(4) violations in light of a corrected legal construction of the stock trust agreement.

In arriving at its final Order the Commission acknowledged that the Missouri Pacific had violated § 5(4) of the Act by acquiring control of Eastern. I agree with Judge Decker's learned majority opinion herein, that such a finding does not automatically require a disapproval of Missouri Pacific's § 5(2) application to acquire control of Eastern. However, in stating the reasons for its final Order the Commission concluded, upon what I believe was an erroneous legal predicate, that Missouri Pacific's violation was redressed or eliminated by its trust agreement with the Marine Midland Bank. The Commission, upon its legally erroneous conclusion and belief that the trust was irrevocable, found that the Missouri Pacific had divested itself and relinquished control over its prior acquired Eastern stock. The Commission therefore, in reaching its public interest conclusion, in summarily dismissing the § 5(4) violation, in finding a divestiture of control and in evaluating the good faith of Missouri Pacific did so on the basis of its conclusion that the trust was irrevocable.* The importance of this conclusion to the Commission's final determination can only be stated by the Commission and should not be conjectured by this court.

Interestingly, in rejecting the Cotton Belt's argument addressed to the practicalities of it or of other railroads considering merging with Eastern, first the Commission and now this court necessarily assume that the trustees are independent. I feel that the legal correctness of such an assumption must be challenged where as here the trust is revocable.

The general rule of law applicable to trusts such as that created here where the settlor is the sole beneficiary is well stated by Judge Decker at page 426 of the majority opinion. I need not repeat or requote from § 339 of the Restatement of the Law of Trusts. Such trusts are revocable at the will of the settlor-beneficiary.

Applying this principle of law to the instant facts it follows that Missouri Pacific had the right at any time to compel a termination of the trust; the Marine Midland Bank trust was not irrevocable and Missouri Pacific was not divested of control over its Eastern stock holdings.

Missouri Pacific's legal arguments which attempt to except or distinguish the Marine Midland Bank trust from the general rule of law succinctly stated in Restatement of the Law of Trusts § 339, arguments apparently accepted by the majority opinion, are in my opinion, unavailing. Those arguments, three in number, are briefly as follows:

1) In Delaware an exception exists as to commercial trusts designed to achieve a specific business purpose where third parties have an interest in its purpose. Although possibly this argument might apply were the law of Delaware controlling, the fact remains the situs of the Marine Midland Bank trust is New York.

2) The power of the Commission to redress illegal control situations "is practically plenary".

3) Missouri Pacific is not likely to eliminate or revoke the trust.

The inapplicability of (2) and (3) above is apparent. As pointed out throughout Judge Decker's Opinion the issue is one of control; whether or not

---

* This court's majority opinion, page 427, footnote 5 characterizes one of the Commission's references to the trust as being irrevocable as purely descriptive and not conclusionary. I am unable to agree with this characterization. In light of the Commission's opinion there can be little question but that the Commission clearly concluded that the trust was legally irrevocable and so treated it.

Missouri Pacific's § 5(4) violation was redressed. The issue is not whether Missouri Pacific would take advantage of a position it gained by reason of its § 5(4) violation or what the Commission could do in the face of Missouri Pacific's exercise of control.

I am further unable to agree with the majority of the court that this trust issue has little to do with the case or is of minor importance.

The nature of the trust, necessarily determined by its legal effect, is a paramount public interest issue and an evaluation of Missouri Pacific's § 5(4) violation. It necessarily affects the control or absence of control Missouri Pacific had over its Eastern stock, and any determination of Missouri Pacific's good or bad faith.

In the same context I should like to observe that the Commission in similar but subsequent § 5(2) acquisition proceedings directed towards the Chicago South Shore and South Bend Railroad issued an Order (Finance Docket Nos. 23141, 23566 and 23587) directing further investigation into a similar trust agreement.

I agree that the determination of this revocability issue is only part, (however I believe it to be a major part) of matters considered by the Commission in its determination of the overriding issue of control of Eastern stock by Missouri Pacific. From this I necessarily agree that the Commission could have arrived at the same determination of the case notwithstanding it having determined the trust to be revocable. The fact remains, however, that the Commission has not made such a determination. In effect the majority opinion now makes this determination for the Commission and I feel without legal authority.

Similarly related to Missouri Pacific violations of § 5(4) were its later actions, subsequent to the creation of the aforementioned trust, wherein it further acquired additional stock in Eastern. For reasons not entirely apparent to the court

the Commission arbitrarily and in an apparent abuse of its discretion refused to consider such evidence, evidence which in my opinion necessarily relates to the initial § 5(4) violation and might well tend to show a further violation in flagrant disregard of the Commission and of the Act. Central of Georgia Ry. Co. Control, 307 ICC 39 (1958).

Although apparently reasonable and proper in the context of the limited facts before it and of its own erroneous legal conclusion, the question now arises whether the public interest is still preserved or whether a consideration of these additional related facts viewed in their proper legal setting might not lead the Commission now to conclude that this case falls within or more closely approximates its prior holding in the Central of Georgia case.

In dissenting I should like also to note that I am fully aware of the Commission's recent Order of June 23rd denying herein the St. Louis Southwestern Railway Company's petition for reopening, further hearing and reconsideration. It seems to indicate what I somewhat suspected. If the case were referred back to the Commission, as legally I believe it should be, the Commission would probably reach the same results with negligible concern to new facts or corrected legal constructions. Notwithstanding this seeming apparent uselessness of remand I am still of the belief that it would be better and more accurate legal procedure to return this case to the Commission and require it go on record as to the consequences of the additional facts and corrected legal conclusions herein expressed.

Were I to prevail in remanding this case to the Commission I would also direct the following further inquiry and necessary finding and conclusion adjustments.

The Commission's order of 1965 was based, and significantly depended upon, the pre-1962 depressed financial condition of Eastern. It is apparent on the basis of the pleadings and briefs now

before the court that Eastern has benefited from major and significant advancements in its financial status since 1962. Many of these changes were activated and took place prior to the entry of the Commission's final order in 1965. By way of a petition to reopen the record, attempts were made to present this information to but were rejected by the Commission. Whether or not this information would have caused a change in the Commission's final order is again purely conjectural. However, the relevancy and significance of this information can not be questioned and I would have the Commission reopen the record to give it proper consideration.

In the course of considering 1962 to 1965 changes in Eastern's financial status, the Commission would be further enlightened by the more recent Eastern financial statements.

Further, I would direct the Commission to review and make findings as to the facts surrounding the Dempsey-Tegeler and Eastman-Dillon convertible bond purchases, specifically inquiring into the length of time the bonds were held and to whom they were sold.

Also, the Monon's evidence, heretofore ignored by the Commission, should be heard and a finding should be made as to what effect, if any, the Commission's present ruling will have on the Monon—L&N dispute. The intended scope and extent of the Commission's directive, if renewed, that the Missouri Pacific negotiate the sale of what has been referred to as the Evansville line to the L&N should be made more exacting and definitive. Necessarily, the effect of this directive on the Monon or on a subsequent § 5(2) application should be spelled out. The briefs and arguments before the court demonstrate a complete and total uncertainty and disagreement among all parties as to this issue.

A remand would also serve to enable our most recent intervenor, the St. Louis Southwestern (Cotton Belt), properly to be heard.