**CENTRAL MOTOR LINES, INC.,**
**Plaintiff,**

v.

**UNITED STATES of America, and Interstate Commerce Commission,**
**Defendants,**

and

**Carolina Freight Carriers Corporation,**
**Intervening Defendant.**

**Civ. A. No. 2455.**

United States District Court
W. D. North Carolina,
Charlotte Division.

Nov. 10, 1969.

Eugene T. Bost, Jr., Concord, N. C., Nuel D. Belnap, Harold E. Spencer and Daniel J. Sweeney, Swidler & Belnap, Chicago, Ill., for plaintiff.

Richard W. McLaren, Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., and Joseph R. Cruciani, Asst. U. S. Atty., Charlotte, N. C., for the United States.

Robert W. Ginnane, Gen. Counsel, and Barry Roberts, Atty., Interstate Commerce Commission, Washington, D. C., for Interstate Commerce Commission.

F. A. McCleneghan, McCleneghan, Miller, Creasy & Johnston, Charlotte, N. C., James E. Wilson and Jon F. Hollengreen, McInnis, Wilson, Munson & Woods, Washington, D. C., for Carolina Freight Carriers Corp., intervening defendant.

Before CRAVEN, Circuit Judge, and JONES and McMILLAN, District Judges.

## PRELIMINARY SUMMARY

McMILLAN, District Judge:

The Interstate Commerce Commission issued an order approving the purchase by Carolina Freight Carriers Corporation, of Cherryville, North Carolina, of the interstate operating rights of Harry B. Wilson, doing business as Wilson's Motor Transit. The Commission found that allowing Carolina to acquire these rights would be in the public interest. Central Motor Lines, Inc., a competing

carrier, filed this suit seeking a judgment setting aside the Interstate Commerce Commission's order. The findings and conclusions of the Interstate Commerce Commission have a fully rational basis and are reasonable and in full accord with the public interest and are not otherwise objectionable and are amply supported by substantial evidence. The Commission's order is approved and the relief sought is denied.

## OPINION

Before September 2, 1966, Carolina Freight Carriers Corporation handled freight shipments between the Carolinas, Georgia and Florida on the one hand and various points in the northeast. It also served Chicago and the Great Lakes area, but it had to do so by interlining with other carriers at Dayton, Ohio and some other midwestern points. Carolina could not haul its own freight past Dayton and the other points 'of interchange. Wilson, with headquarters at Middletown, Ohio, was a relatively small carrier but it held rights to transport general commodities between Chicago and Ohio.

On September 2, 1966, Carolina applied to the Commission for authority to buy Wilson's rights. The Commission authorized Carolina to lease Wilson's rights temporarily pending final determination of the issue, and Carolina has been operating under Wilson's rights since late in 1966.

The hearing examiner recommended that the purchase, in the main, be approved; but he recommended that freight between Chicago and the Carolinas be excluded from the single-line authority and that Carolina be required to interchange at Dayton all freight between the Carolinas on the one hand and Chicago on the other. The Commission's order did not include this proposed hobbling of Carolina's service, and the order as entered allows Carolina to give single-line service between Chicago and the other points on Wilson's lines in the midwest and the Carolinas as well as Georgia and Florida in the southeast.

Commission approval of transfer of freight hauling rights is authorized by 49 U.S.C. § 5(2) (a) (i).

49 U.S.C. § 5(2) (b) provides that:

"(b) Whenever a transaction is proposed under subdivision (a) of this paragraph, the carrier or carriers or person seeking authority therefor shall present an application to the Commission, and thereupon the Commission * * * shall afford reasonable opportunity for interested parties to be heard. If the Commission shall consider it necessary in order to determine whether the findings specified below may properly be made, it shall set said application for public hearing; * * *. If the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed transaction is within the scope of subdivision (a) of this paragraph and will be *consistent with the public interest,* it shall enter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable: * * *." (Emphasis added.)

■ In reviewing the Commission's action, the primary question before the court is whether the decision of the Commission that the transfer of operating rights is consistent with the public interest is a conclusion "supported by substantial evidence on the record considered as a whole, * * * free from errors of law * * * and * * * not so arbitrary or capricious as to constitute an abuse of discretion." Youngblood Truck Lines, Inc. v. United States, 221 F.Supp. 809 (W.D.N.C., 1963). It does not matter that the hearing officer who prepared a report for the Commission thought the authority should be limited nor would it matter that the court itself (if that were the case) might prefer to reach a different result. The job of making the decision is that of the Commission, the group of experts appointed for the purpose. The court's basic job is to weigh the sufficiency of

the evidence and determine if the Commission's decision has a rational basis, rather than to second-guess the wisdom of the Commission itself. M & M Transportation Co. v. United States, 128 F. Supp. 296, 298 (D.Mass., 1955), aff'd 350 U.S. 857, 76 S.Ct. 102, 100 L.Ed. 762; United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821 (1946).

■ The primary consideration is the interest of the *public*—not the relative economic advantages of competing carriers.

■ The Commission's action is supported by substantial evidence and is consistent with the weight of the evidence.

The principal physical result of approving the purchase without a restriction is that Carolina will now be able to haul freight between the Chicago area and the Carolinas area without having to unload the freight from its own vehicles or stop and switch equipment in Dayton, Ohio. Nothing but increased efficiency can result from allowing freight to travel in one trailer behind one tractor rather than requiring it to be off-loaded or requiring the substitution of different motive power at Dayton.

The service presently supplied to shippers by Central is not satisfactory to the shippers. Testimony of inadequacy or other difficulty with existing service was given, for example, by Munsingwear of Minneapolis (Central's service deteriorated, Tr. pp. 228–229, and delayed, Tr. p. 229); by Arrow Armatures of Spartanburg, South Carolina (Central's service "poor", Tr. p. 238, and shipments delayed, Tr. p. 239); by Fusion-Rubbermaid of Statesville, North Carolina ("lousy service" from other carriers, Tr. p. 259; Central has not solicited his company in several years, Tr. pp. 261–262); by Rheem Manufacturing Company of Chicago (hard to get equipment from Central, Tr. p. 205).

Testimony from numerous shippers showed that the service supplied by Carolina since it started operating under temporary rights about January 1967 had been satisfactory. This testimony included witnesses from Aluminum Company of America (Tr. pp. 177–178); Nodell-Eygertt Distributors of Cincinnati (Tr. p. 154); Federal Cartridge Corporation of Anoka, Minnesota (Tr. p. 161); Chicago Steel and Wire Company (Tr. p. 194); Rheem Manufacturing Company of Chicago (Tr. p. 203); Munsingwear of Minneapolis (Tr. p. 229); Arrow Armatures of Spartanburg, South Carolina (Tr. p. 239); and Fusion-Rubbermaid of Statesville, North Carolina (Tr. pp. 260–261).

Based upon this and other testimony there is no doubt that the findings of the Commission that existing service was unsatisfactory, that Carolina could and would provide better service, and that the public interest would be served by allowing Carolina to join its rights with Wilson's are supported by substantial evidence, are in the public interest and do have a substantial rational basis.

■ Central, the protestant, also asserts as a matter of law the proposition that no rights could be transferred to Carolina unless Carolina had previously been a "significant competitive factor" for traffic between Chicago and the southeast. No pertinent court decision in support of this proposition is cited. The basic issue whether public interest justifies new service can be answered by allowing new carriers to enter an area as well as by allowing expansion of the service of carriers already in the area. The evidence concededly shows that Central has been hauling more freight between the Great Lakes area and the Carolinas than Carolina has been hauling. However, it also shows that before Carolina started operating under Wilson's rights, Wilson was hauling freight at the rate of over 114,000,000 pounds a year, including numerous shipments with destinations or origins in Georgia, Florida, North Carolina and South Carolina (Exhibit B–7). Also, within four of the months of 1966 before acquiring Wilson's rights the evidence shows that

340

Carolina had 4,211 shipments weighing 5,028,502 pounds south bound and 3,338 shipments weighing 2,578,994 pounds north bound between the Great Lakes region, including Illinois, on the one hand and the Carolinas, Georgia and Florida on the other (Exhibit 6).

It is true that before acquiring Wilson's rights Carolina's shipments were a small fraction of the volume of Central Motor Lines. Nevertheless, volumes such as those shown by the evidence can not be deemed insignificant or insubstantial; they certainly support the Commission's findings that neither Carolina's nor Wilson's rights were dormant or inactive, and they amply demonstrate they were two live lines which the Commission joined together when it allowed Carolina to acquire Wilson's rights and start its single-line service.

■ The Commission found that there had been no substantial diversion of traffic from Central to Carolina. Central Motor Lines asserts error of the Commission in failing to find that Central had suffered diversion of traffic to Carolina. As the court reads the evidence, that conclusion is correct. It is true that Carolina's business from Chicago to the southeast has substantially increased since Carolina has been able to offer single-line service. However, the items which Central contends in its brief represent diversions from Central to Carolina are in the main items of freight from shippers who testified either that Central had been providing poor service or had not actively sought their business or that it had been many years since they had been regular shippers on Central. See Transcript, pages 227–229, 238–239 and 198–203. Moreover, even if some direct diversion and some economic loss to a protestant is found or admitted, it is still the Commission's prerogative and duty to franchise new service or joinder of rights if it will serve the public interest. Gateway

Transportation Co. v. United States, 260 F.Supp. 248 (W.D.Wisconsin, 1966); Lang Transportation Corp. v. United States, 75 F.Supp. 915 (S.D.California, 1948); Anderson Motor Service v. United States, 151 F.Supp. 577, 583 (E.D. Missouri, 1957).

■ Some other contentions were made. In response to those contentions the court is of the opinion that the Commission, based on ample evidence, did make sufficient findings of fact to disclose a rational basis for its decision; that its findings were supported by substantial evidence; that no incorrect legal tests or standards were followed by the Commission; that the Commission did not misconstrue nor misinterpret the pertinent statutes; that the Commission had no burden to explain to protestant why it did not follow the recommendation of a hearing examiner with respect to the crippling restriction on single-line service between Chicago and the Carolinas. *No Commission decision existed* until the three-man division met and rendered its decision and order after considering the *recommendations* of the examiner. The Commission sat as a finder of fact, not as a limited appellate court. The Commission's conclusion that although Central Motor Lines might not operate as profitably as it had been in previous years the causes were substantially unrelated to Carolina's activities is again a question of fact on which the evidence supports the Commission's finding. Again, no competing carrier has a right to a guaranteed profit. Finally, the question of consolidating this case with other cases which involve freight rights between Chicago and the Carolinas is a matter within the discretion of the Commission, and no abuse of that discretion is observed here.

The action of the Interstate Commerce Commission is approved, and this action is dismissed.