**CAROLINA FREIGHT CARRIERS COR-
PORATION, a corporation, Cherryville,
North Carolina, Mercury Motor Ex-
press, Inc., a corporation, Tampa, Flor-
ida, Plaintiffs,**

v.

**UNITED STATES of America, and In-
terstate Commerce Commission,
Defendants,**

and

**Pilot Freight Carriers, Inc., a corporation,
Winston-Salem, North Carolina,
Intervenor-Defendant.**

**Civ. A. No. 2674.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

March 4, 1971.

Frank A. McClenegham, F. Thomas Miller, Jr., McClenegham, Miller, Creasy & Johnston, Charlotte, N. C., Edward G. Villalon, David C. Venable, Jon F. Hollengreen, James E. Wilson, McInnis, Wilson, Munson & Woods, Washington, D. C., for Carolina Freight Carriers Corp., a corporation, Cherryville, N. C., and Mercury Motor Express, Inc., a corporation, Tampa, Fla.

Walker B. Comegys, Acting Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., Keith S. Snyder, U. S. Atty, Asheville, N. C., for the United States.

Fritz R. Kahn, Gen. Counsel, and Arthur M. Toback, Atty., I. C. C., Washington, D. C., for the I. C. C.

Hugh L. Lobdell, Charles V. Tompkins, Jr., Kennedy, Covington, Lobdell & Hickman, Charlotte, N. C., L. C. Major, Jr., William F. King, Major, Sage, King & Mitchell, Alexandria, Va., for Pilot Freight Carriers, Inc.

Before CRAVEN, Circuit Judge, and JONES and McMILLAN, District Judges.

## MEMORANDUM OF DECISION AND ORDER

PER CURIAM.

The plaintiffs seek in this action to set aside, vacate, annul, or otherwise suspend a report and order of the Inter-

state Commerce Commission granting a certificate of public convenience and necessity to the intervening defendant, Pilot Freight Carriers, Inc., to operate as a motor common carrier over described regular routes from much of the Northeast into Florida. The Commission proceeding is entitled Pilot Freight Carriers, Inc., Extension—Florida, Docket No. MC–61264 (Sub-No. 16). The plaintiffs, Carolina Freight Carriers Corporation and Mercury Motor Express, Inc., are motor carriers and have existing authority to operate in Florida and other areas involved in this controversy.

We affirm the Commission and dismiss the action.

The intervening defendant, Pilot Freight Carriers, Inc., filed an application on May 10, 1965 for a certificate of public convenience and necessity which would allow it to operate single-line freight service between many points in the Northeast and most of Florida. Protests were filed by several motor carriers, including the plaintiffs in this action. The application was referred to a hearing examiner and hearings were conducted intermittently from November 1966 to January 1968 resulting in nearly 11,000 pages of testimony and 700 exhibits. The examiner found there was a substantial need for service between Pilot's present operating area and the Florida Peninsula and that the protestants could not fully meet these needs either jointly or through single-line service. He further found that Pilot was willing and able to meet the needs of the area and recommended that the requested authority be granted in full.

The protestants, including the plaintiffs in this action, filed exceptions to the examiner's report on March 17, 1969, and Division 1 of the Commission affirmed the report with certain modifications, the most pertinent one being that the authority granted could not be joined with the existing authority in the Akron-Cleveland area.

The plaintiffs and Pilot petitioned for re-consideration and Division 1 of the Commission acting as an Appellate Division, on February 11, 1970 modified the authority to provide service between the Ohio area and Florida but otherwise affirmed the findings and report. The plaintiffs and another protestant filed petitions for re-consideration and additional hearings which petitions were denied by order of the Appellate Division dated May 4, 1970.

This action was instituted on May 27, 1970, and a motion for a temporary restraining order was heard and denied. The certificate was issued to Pilot by the Commission on July 17, 1970. The case was set for hearing before a three-judge court pursuant to 28 U.S.C.A. § 2284, and was heard in Charlotte on November 5, 1970, before Circuit Judge J. Braxton Craven, Jr., and District Judges Woodrow W. Jones and James B. McMillan.

The basic assignment of error advanced by the plaintiffs was that the orders of the Commission were arbitrary, capricious and unreasonable; constituted an abuse of administrative discretion; were based upon an unwarranted, general and conclusionary interpretation of facts of record; failed to properly evaluate evidence of record, and were predicated on misinterpretations both of law and evidence. Some twenty-five reasons are listed as a basis for such assignment of error which may be summarized as follows:

1. The Commission erred in failing adequately to consider the competitive impact and effect of new services recently authorized by the Commission in the same territory, and failed and refused to grant a further hearing requested by the plaintiffs to develop these facts.

2. The Commission erred in reaching a decision based upon a stale and incomplete record, and failed adequately to explain the basis for, or the reasoning relied upon in the decisions of its Division 1 acting as an Appellate Division.

3. The Commission's decision constitutes a departure from the long established doctrine that existing carriers are

to be afforded an opportunity to transport all traffic they can handle in an adequate and efficient manner without the added competition of a new operation.

4. The Commission failed to accord the plaintiffs due process of law in that it failed to comply with The Administrative Procedures Act and The National Transportation Policy as determined by Congress.

5. The Commission's decision is not supported by substantial evidence of record, nor is it predicated upon uncontroverted and credible evidence.

Section 207(a) of the Interstate Commerce Act, 49 U.S.C.A. § 307(a), provides in part that:

"Subject to section 210, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application, *if it is found that the applicant is fit, willing, and able properly to perform the service proposed* and to conform to the provisions of this part and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, to the extent to be authorized by the certificate, *is or will be required by the present or future public convenience and necessity;* otherwise such application shall be denied * * *." (Emphasis supplied.)

As indicated by the foregoing statute, the Commission is empowered and directed by Congress to issue a certificate to any qualified applicant if it finds (1) that the applicant is fit, willing, and able properly to perform the service proposed, and (2) that the proposed service is or will be required by the present or future public convenience and necessity. The Commission has made such finding in this case and the matter is now before this Court for review.

The function of this Court upon this judicial review is limited in scope to the determination of the primary question of whether the decision of the Commission is supported by substantial evidence on the record considered as a whole, free from errors of law and not so arbitrary, capricious or unreasonable as to constitute an abuse of discretion. Central Motor Lines, Inc. v. United States, 309 F.Supp. 336 (338) (W.D.N. C.1969); Youngblood Truck Lines, Inc. v. United States, 221 F.Supp. 809 (W. D.N.C.1963). The test on this judicial review is whether the action of the Commission is supported by substantial evidence on the record as a whole, and whether the Commission's procedures have denied the plaintiffs any substantive right. Carolina Freight Carriers Corp. v. United States, 307 F.Supp. 723, 726 (W.D.N.C.1969); Illinois Central Ry. Co. v. Norfolk & W. Ry. Co., 385 U. S. 57, 87 S.Ct. 255, 17 L.Ed.2d 162.

Substantial evidence was defined by the Supreme Court in the case of National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U. S. 292, 59 S.Ct. 501, 505, 83 L.Ed. 660 as follows:

"Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' Consolidated Edison Co. of New York v. National Labor Relations Board, supra [305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126], 59 S.Ct. 217, and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury."

Plaintiffs' contention that the Commission's decision is not supported by substantial evidence is the major issue in this cause. We will now direct our attention to this phase of the case.

Pilot offered evidence to show, and the hearing examiner found, that it had been engaged in the performance of motor carrier operations in interstate commerce since December 1, 1941, and at present operates over extensive regular and irregular routes between the states of Connecticut, Massachusetts, Rhode Island, New York, New Jersey, Delaware;

portions of Pennsylvania and Maryland and the District of Columbia, on the one hand, and on the other, points in North Carolina, South Carolina, Virginia, and points in Georgia north of U. S. Highway 80. It also operates between the states of North Carolina, South Carolina, Virginia, and Northern Georgia. It is authorized to operate between Augusta and Savannah, Georgia, and points in North and South Carolina, on the one hand, and, on the other, Akron, Ohio, and points within twenty-five miles thereof, and points in the Cleveland, Ohio, commercial zone. It has 36 terminals strategically located throughout its system. Its base of operation is Winston-Salem, North Carolina.

As of November 1, 1966, Pilot owned and operated a total of 451 tractors and 909 trailers of various kinds normally utilized in a general commodity operation. The evidence further shows that as of July 1, 1966, Pilot employed a total of 1,567 employees, 399 of which are over-the-road drivers. An extensive safety program headed by a Director of Safety with a staff of 7 full-time employees is maintained. Balance sheets and profit and loss statements for the year 1965 showed the company to be in a sound financial condition. Many witnesses, who had prior experience with Pilot's service in single-line operations, testified to their satisfaction with its service and expressed opinions indicating that Pilot would be able to furnish adequate and responsible service if granted authority to extend its operations into Florida.

■ There is ample and substantial evidence in the record to support the examiner's finding that Pilot is "fit, willing, and able properly to perform the service proposed."

Impressive evidence was offered to show phenomenal population growth and industrial development of the entire state of Florida and particularly within the counties located in the proposed service area, the Florida Peninsula, during the years from 1950 to 1965. The evidence discloses that during this period the state's population increased 109% while the entire country showed only a 28% population growth. The Florida Peninsula during the same time showed a population increase of 115%. From 1950 to 1964 Florida moved from 20th to 9th among the states in terms of population. Per capita income showed a growth rate of 88% compared to 82% nationally during the period from 1950 to 1965. These figures and many more caused an economist who was called as a witness to declare, and the examiner to find, that Florida has become an area of increasing importance as a market for consumer goods.

The industrial growth and development of Florida has also been phenomenal with the greatest emphasis being in the field of light industry. From 1961 to 1965, 3,027 new plants or additions to plants began production in Florida. 2,701 of these new facilities, or 89% of the total, were in the area of the proposed authority, the Florida Peninsula. The evidence shows that a substantial number of existing plants as well as the new industries are relatively small, and would likely depend upon common carriers for the transportation of their products.

Florida's rapid industrial and population growth in the past years has stemmed in large part from its natural resources and attractive climate. Common sense tells us that such growth will require an ever-expanding transportation system to serve the needs of the new shippers of the area as well as the expanding consumer market. In former years out-bound traffic from Florida was made up primarily of raw materials and agricultural products, but the rapid industrial growth of the past 15 years has produced an increased amount of traffic composed of finished goods produced by light industry. Shippers of these commodities who are attempting to operate successfully in today's competitive market and who desire to utilize the resources of distribution that are now available must have access by way of common carrier transportation to major

population centers. This service must not only be available, but must be prompt and dependable.

The evidence shows the existing transportation service is not sufficient to meet the needs of the expanding economy of the area. One of the great problems is the lack of single-line service from the Northeast to the Florida Peninsula and from Florida to the Northeast. To a great extent shipments to and from these points must depend upon joint-line service which proves to be too slow for today's competition. A few examples taken from the record will illustrate this problem. *Jacksonville*, with a population of 198,000, is served by a total of 14 general commodity carriers, of which only 5 operate East-South in single-line service and only 2 participating in North-South traffic; *Orlando*, with a population of 93,500, is served by a total of 8 general commodity carriers, of which 4 operate East-South and 2 North-South; *Miami*, with a population of 325,000, is served by 9 general commodity carriers, with 4 operating East-South and 2 North-South; and *Tampa*, with a population of 305,000, also has a total of 9 carriers, with 4 operating East-South and 2 North-South. Comparison of this service with that available to Pilot terminal points of equivalent populations reveals that: *Akron*, with a population of 298,000, has a total of 77 carriers, of which 14 provide service between Akron and the Southern States, but with no carrier offering a single-line service to Florida; *Providence*, Rhode Island, with a population of 195,000, is served by 109 carriers, 16 of which operate a single-line service into the South, but only 1 of which offers a single-line service to Florida; and *Norfolk*, Virginia, with a population of 322,000, is served by 34 carriers, 12 of which operate East-South, but only 1 carrier offers a single-line service to Florida.

The problems associated with joint-line service were graphically described by witnesses of two shippers, namely: Bernz-O-Matic Corporation, of Roches-

ter, New York, and Saalfield Publishing Company, of Akron, Ohio. Both shippers used joint-line service into Florida. Shipments from Bernz-O-Matic to Florida take from 6 to 15 days while its shipments to the West Coast take only 6 days. Saalfield, dissatisfied with slow service to Florida, which was from 1 to 2 weeks, and unhappy with complaints of customers and salesmen, switched to rail service. Scores of other witnesses testified to delays and inadequate service. This testimony was such that the Commission could reasonably conclude:

"The evidence submitted by applicant, supporting shippers and receivers, and supporting motor carriers demonstrates that there is substantial and material inadequacy in present motor carrier service, both direct and joint-line, now available between points in the Florida Peninsula, on the one hand, and, on the other, applicant's present operating area."

Plaintiffs further contend that in the event the Commission should find the need for additional service, the existing carriers must be afforded an opportunity to transport all traffic they can handle in an adequate and efficient manner without the added competition of a new operation.

The Commission found, and there is substantial evidence to support such findings, that existing carriers, including the recently certified R-C Motor Lines, Inc., and Alterman Transport Lines, Inc., cannot meet Florida's need for better service. It is fundamental that the Commission should consider the public interest in maintaining the financial health and stability of existing carriers. However, this is but one of the many essential elements to be considered in determining public convenience and necessity. The Supreme Court in United States v. Dixie Highway Express, Inc., 389 U.S. 409, 88 S.Ct. 539, 19 L.Ed.2d 639, reversed a district court ruling that the "unvariable rule" of the Commission was to grant existing carriers an opportunity to remedy deficiencies in service and that carriers have a property right

to such opportunity before a new certificate may issue upon a lawful finding of public convenience and necessity pursuant to statute. The court held:

"The Commission's power is not so circumscribed. No such limitation has been established by the Commission's own decisions or by judicial determinations. It is, of course, true that the Commission should consider the public interest in maintaining the health and stability of existing carriers, see United States v. Drum, 368 U.S. 370, 374, 82 S.Ct. 408, 410, 7 L.Ed.2d 360 (1962); but it is also true that, upon the basis of appropriate findings, 'the Commission may authorize the certificate even though the existing carriers might arrange to furnish successfully the projected service.'"

The plaintiffs contend they were denied due process of law in the following instances: (1) The Commission used the "Dando" procedure in the instant case; (2) The Commission failed to grant a new hearing and decided the case upon a stale record; and (3) The Commission failed to give proper attention to all their contentions. Our examination of the record reveals these contentions to be without merit.

■ The use of the "Short Form Decisional Process" which is referred to as "Dando", is discretionary with the Commission and has been held by many courts to be permissible. It seems to be settled law that where the Commission finds no material error in the statement of facts and conclusions thereon by the hearing examiner, it is not required to prepare a detailed report but may affirm and adopt the report as its own. Carolina Freight Carriers Corporation v. United States, 307 F.Supp. 723 (W.D.N. C.1969). When the "Dando" procedure is used, it means, of course, that the Commission's action stands or falls upon the examiner's report.

■ The Administrative Procedure Act does not require the Commission or the examiner to make a full, complete, and precise finding on every issue raised by the parties. Minneapolis and St. Louis R. Company v. United States, 361 U.S. 173, 80 S.Ct. 229, 4 L.Ed.2d 223. The Act requires findings sufficiently complete to enable the reviewing court to discuss with confidence the Commission's conclusions and its underlying reasons and then to judge whether the Commission acted within its statutory powers. Alabama Great Southern R. Company v. United States, 340 U.S. 216, 71 S.Ct. 264, 95 L.Ed. 225.

■ The plaintiffs place great stress upon the failure of the Commission to grant a new hearing and contend its decision is based upon a stale record. These contentions raise serious questions as to due process and the needs of the area since two additional carriers have been authorized to operate in Florida since the hearings. The examiner and the Commission were aware of the new certificates granted to R-C and Alterman and determined from all the record that the existing carriers could not meet the needs of service into Florida. A request for additional hearings is addressed to the sound discretion of the Commission and the denial of a petition for a re-hearing based upon a claim that the record is stale does not constitute an abuse of discretion on the part of the Commission. United States v. Pierce Auto Freight Lines, 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821; Interstate Commerce Commission v. Jersey City, 322 U.S. 503, 64 S.Ct. 1129, 88 L.Ed. 1420.

■ Without a doubt this would be considered a stale record. The application was filed in May, 1965, and the hearings ranged from November, 1966, to January, 1968, with the examiner's report and recommendation being filed January 27, 1969. Of course, the plaintiffs through the proper exercise of their rights have contributed to the delay in the decision. They cross-examined witnesses and offered testimony and filed exceptions, motions for new hearings, re-consideration, and this law suit. All of these procedures take time and this Court implies no criticism on the part of any person for exercising le-

gal rights, but as a practical matter there seems to be no way to avoid a so-called stale record in a long complex case of this nature. However, decisions must be made and the Commission denied motions for further hearings and entered its order, and in so doing we do not find an abuse of discretion.

In Illinois Central Rly. Company v. United States, 263 F.Supp. 421, 434 (N. D.Ill.1966), affirmed 385 U.S. 457, 87 S.Ct. 612, 17 L.Ed.2d 509 (1967), the court said:

> "The record is unquestionably stale. However, that fact alone is insufficient to justify an order compelling the Commission to reopen. Records in long and complex cases are inevitably outdated on the day of decision and the Commission has broad discretion to refuse to permit further delay to obtain evidence of changed conditions."

The other contentions of the plaintiffs have been examined and found to be without merit. The Commission's decision and order is based upon adequate facts which are supported by substantial evidence and should be affirmed. We therefore affirm the Commission, and dismiss the action.