**ANN ARBOR RAILROAD COMPANY et al., Plaintiffs,**

**v.**

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

**Civ. A. No. 73–881.**

United States District Court, E. D. Pennsylvania.

Dec. 18, 1973.

Robert D. Brooks, New York City, Emried D. Cole, Jr., Louisville, Ky., Philip S. Brown, Kansas City, Mo., Martin L. Cassell, Jr., Chicago, Ill., J. T. Clark, Cleveland, Ohio, John A. Daily, Philadelphia, Pa., Kemper A. Dobbins, Norfolk and Western Railway Co., Roanoke, Va., Edward A. Kaier, Philadelphia, Pa., G. H. Kleinberger, Albany, N. Y., Howard D. Koontz, Chicago, Ill., Albert W. Laisy, Baltimore, Md., Richard D. Lalanne, New York City, Joel E. Mazor, Philadelphia, Pa., C. Harold Peterson, Minneapolis, Minn., Richard H. Stokes, Jamaica, N. Y., T. E. Tisza, New York City, Sidney Weinberg, Boston, Mass., for plaintiffs.

Arnold P. Lav, Carl D. Lawson, Dept. of Justice, Theodore C. Knappen, I. C. C., Washington, D. C., Kenneth H. Vail, Dept. of Agriculture, Washington, D. C., for defendants.

W. Charles Hogg, Jr., Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for defendant, intervenors, American Plywood Assn.

Before VanDUSEN, Circuit Judge, and LUONGO and HUYETT, District Judges.

## OPINION AND ORDER

HUYETT, District Judge.

Plaintiff railroads seek a permanent injunction (1) restraining the Interstate Commerce Commission from implementing its Order of March 30, 1973 in Ex Parte No. 252 (Sub. No. 1) Incentive Per Diem Charges—1968, —— ICC —— (1973) made under § 1(14)(a) of the Interstate Commerce Act, and (2) ordering the Commission to reconsider its Order of April 28, 1970 also entered in Ex Parte No. 252 (Sub. No. 1) Incentive Per Diem Charges—1968, 337 ICC 246 (1970). Pending final resolution by a three-Judge court of the relief sought by plaintiffs' complaint, a single judge upon a finding of irreparable damage pursuant to 28 U.S.C. § 2284(3) restrained implementation by the Commission of the March 30, 1973 Order.[1] Jurisdiction to consider the issues raised by plaintiffs' complaint is conferred by 28 U.S.C. § 1336(a) (1970). The mode of procedure required in an action seeking to restrain the operation or execution of a Commission Order is established by 28 U.S.C. §§ 2321–2325. Relief is also sought pursuant to the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1970).

Various railroads have intervened either in support of or in opposition to the relief requested by plaintiffs. An association of shippers, the American Plywood Association, has intervened as a defendant. The United States, although by statute a defendant in these proceedings, 28 U.S.C. § 2322, supports the relief sought by plaintiffs.[2] The Secretary of Agriculture has also intervened as a defendant.

## I. Incentive Per Diem (IPD) Program

By its April 28, 1970 Order the Commission embarked on a new effort to solve an old and continuous problem. The chronic shortage of freight cars has inflicted this nation's economy since the inception of the Commission.[3] One

---

1. Ann Arbor Railroad Company v. United States, 358 F.Supp. 933 (E.D.Pa.1973).

2. References to the contentions made by plaintiffs will include those made by the United States.

3. See In the Matter of Car Shortage and Other Insufficient Transportation Facilities, 12 ICC 561 (1907); Car Supply Investigation, 42 ICC 657 (1917); I. L. Sharfman, The Interstate Commerce Commission at 95 n.31.

cause of freight car shortages is the inefficient handling by railroads which use other railroads' freight cars. A user railroad has little incentive to return quickly the cars to the owner railroad whose need for the cars may have arisen after the cars were transferred off the owner railroads' tracks. Furthermore, a user railroad may find it less expensive to use other railroads' cars rather than purchase an adequate supply for its own use. The Commission's April 1970 Order provides for the payment of incentive per diem (IPD) charges by railroads which use unequipped boxcars owned by other railroads. The incentive charges are amounts in excess of compensation reflecting the ordinary costs an owner railroad is allowed to charge for use of its boxcars (the basic per diem charge).[4] The Commission's authority to provide for such incentive payments under the Interstate Commerce Act as amended by the Esch Car Service Act of 1917, 40 Stat. 101, had been found lacking by the court in Palmer v. United States, 75 F. Supp. 63 (D.D.C.1947). But by further amendment to the Interstate Commerce Act in 1966, 49 U.S.C. § 1(14)(a),[5] the

Commission was given explicit authority to provide for incentive charges.

After an initial period studying the car supply problem, the Commission issued a report proposing the adoption of IPD on a six-month basis beginning September 1 of each year and running through February of the following year. 337 ICC 183 (1969).[6] With certain minor modifications IPD was adopted by the Commission in its Order of April 28, 1970. 337 ICC 217, 246 (1970).

The IPD program adopted by the Commission contained the following features: (1) IPD would be charged only for the use of unequipped boxcars, (2) the amount of IPD chargeable was designed to increase the rate of return on investment allowed car owners to an overall 12 percent per year, (3) the incentive charge was to apply for the six-month period of September through February, (4) the excess of incentive charges received by a railroad over the amount paid by it was to be set aside as earmarked funds for the purchase, building or rebuilding of general service, unequipped boxcars, and (5) railroads having net credit balances of IPD funds

---

4. Compare § 1(15) of the Interstate Commerce Act providing authority to impose penalty per diem charges.

5. The Commission may, after hearing, on a complaint or upon its own initiative without complaint, establish reasonable rules, regulations, and practices with respect to car service by common carriers by railroad subject to this chapter, including the compensation to be paid and other terms of any contract, agreement, or arrangement for the use of any locomotive, car, or other vehicle not owned by the carrier using it (and whether or not owned by another carrier), and the penalties or other sanctions for nonobservance of such rules, regulations, or practices. In fixing such compensation to be paid for the use of any type of freight car, the Commission shall give consideration to the national level of ownership of such type of freight car and to other factors affecting the adequacy of the national freight car supply, and shall, on the basis of such consideration, determine whether compensation should be computed solely on the basis of elements of ownership expense involved in owing and maintaining such type of freight car, includ-

ing a fair return on value, or whether such compensation should · be increased by such incentive element or elements of compensation as in the Commission's judgment will provide just and reasonable compensation to freight car owners, contribute to sound car service practices (including efficient utilization and distribution of cars), and encourage the acquisition and maintenance of a car supply adequate to meet the needs of commerce and the national defense. The Commission shall not make any incentive element applicable to any type of freight car the supply of which the Commission finds to be adequate and may exempt from the compensation to be paid by any group of carriers such incentive element or elements if the Commission finds it to be in the national interest. As amended May 26, 1966, Pub.L. 89–430, § 1, 80 Stat. 168.

6. The events leading up to the adoption by the Commission of its April 28, 1970 Order have been summarized at United States v. Florida East Coast Railway Co., 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973); Long Island R. Co. v. United States, 318 F. Supp. 490 (E.D.N.Y.1970).

could not use the IPD funds to build, rebuild or purchase additional unequipped boxcars until after the carrier had, in the same calendar year, built or purchased new general service unequipped boxcars beyond the annual average number of cars purchased, built or rebuilt in the five-year period of 1964 to 1968 and make up any arrearage in having failed to maintain such average during the period the Commission's Order was in effect.

The Commission rejected carriers' proposals that IPD also apply to cars other than unequipped boxcars—such as covered hopper cars. It was noted that the boxcar remained the "workhorse" of the freight car fleet and that the Commission had not been shown evidence the boxcar "can or will be replaced in that role." To achieve an overall 12% return on investment the Commission imposed a 18% rate during the September to February IPD months. The 18% IPD rate when combined with a 6% basic per diem during the year would result in an annual 12% rate. In adopting a 12% average annual rate the Commission stated:

> The data that we have seen convince us that no higher rate of return than 12 percent is needed to serve as a reasonable incentive, and that a higher figure would, therefore, provide unjust and unreasonable compensation to freight car owners.

337 ICC 217, 225 (1970).[7]

Limitation of IPD to a six-month period was premised on the Commission's finding that this period was a heavy loading period both nationally and regionally. Proposals that IPD apply during the full year were rejected by the Commission. The Commission further considered that six-month application of IPD would have benefits in car utilization practices which would "spill over" into the months when IPD was not in effect. The earmarking of funds for IPD was designed to insure funds for the purchase and rebuilding of boxcars and to prevent the use of the funds for general railroad purposes.

The test period requirement was aimed at stemming the "present down trend in the national supply of plain box cars." The Commission stated its rationale for the five-year test period as follows:

> In the absence of the 5-year average, the creditor railroads could simply use the incentive funds to purchase their ordinary car replacements and maintain the present declining rate of replacements. This would not be a satisfactory response to the shipper requirements for additional boxcars shown of record.

337 ICC 217, 229 (1970).

Other proposals for a moving average test period and for lessening the cumulative yearly requirement of purchasing boxcars before IPD funds could be used were rejected by the Commission.

The IPD program as established by the Commission's April 1970 Order was effective for two periods—September 1970 to February 1971 and September 1971 to February 1972—when petitions were filed by a number of carriers requesting reconsideration of the IPD program. Most of the petitions for reconsideration by the Commission of its April 1970 Order sought modifications in the IPD program reflecting each carrier's experience. Many carriers requested that IPD funds be available to acquire cars other than boxcars and that the test period restriction be eliminated in order that IPD funds could be expended without having to first draw upon the carrier's own funds. A number of carriers called for terminating the IPD program entirely and others, primarily the carriers in reorganization,

---

7. See also, 337 ICC 226 n. 10 where the Commission states: "Of course, we could not increase the incentive rate of return to 18 percent throughout the year, since an overall annual rate of return of 18 percent would exceed a reasonable level of compensation to freight car owners."

requested exemptions for groups of carriers.

Without addressing itself to the petitions for reconsideration of the April 1970 Order, the Commission on March 6, 1973, proposed that IPD be extended to apply throughout the year under the same conditions existing during the September to February period. The March 6th Order cited statistics supplied by the Association of American Railroads reflecting a decline in the number of boxcars installed and an increase in the number of boxcars retired. The Commission further stated:

> [T]hese statistics demonstrate that the nation is facing an increasing critical plain boxcar shortage, which shortage has escalated drastically during the last eight months to the point where it is now greater than at any other time in the history of the Commission, that the car supply crisis has been occasioned primarily by the unprecedented demand for movement of grain brought about by the Russian wheat sale agreement, that despite the existence of funds earmarked for the purchase, building or rebuilding of unequipped boxcars, the railroads, during the last four years, have retired more than three times as many plain boxcars as they have installed or rebuilt, and that the seasonable abatement in the shortage which normally occurs after February is not in evidence and, on the contrary, the demand for equipment is greater than at any time during the past six months.

—— ICC —— (1973).

The Commission ordered that verified statements of fact, briefs and statements of position respecting the proposed amendment be submitted on or before March 23, 1973. Unlike previous orders of the Commission in the IPD proceedings, the March 6th Order did not require that submissions of any party be served on the other parties of record.

Twenty-three carriers, three shipper interests, the Kansas City Board of Trade, the Secretary of Agriculture and the General Services Administration filed responses to the Commission's March 6th Order. Eleven of these responses stated unequivocal support for extension of IPD to a year-round basis. Of these eleven responses, six urged, however, that substantial modifications be made in the IPD program as structured. The Commission was urged to allow accumulated IPD funds be expended for covered hopper cars, that the 1964–1968 test period restriction be eliminated and that the charge imposed for use of another railroad's boxcar be increased.

Other railroads expressed opposition to extention of IPD to a year-round basis. Most of these responses opposed to extension also urged substantial modifications of the IPD program if the Commission decided to continue IPD. Other responses reflect the view that it is unrealistic for the Commission to expect carriers to purchase boxcars which are long-term investments in order to alleviate a short-term shortage caused by the Russian wheat grain sale and that car service rules, not in effect when IPD was first imposed, had substantially lessened the need for the IPD charges.

By Order of March 30, 1973, —— ICC —— (1973), the Commission extended IPD to a year-round basis effective May 1, 1973. Implementation of the March 30th Order was enjoined by the single judge on April 30, 1973. By Order of April 24, 1973, the Commission reopened the proceedings in Ex Parte No. 252 (Sub. No. 1) for the purposes of determining (1) whether the funds now earmarked for boxcars should be permitted to be drawn down for the acquisition of other types of cars in demand, like covered hoppers, and whether such modification would increase the number of boxcars available for general use, (2) whether the existing test period average should be modified in any respect, (3) whether a specified period should be prescribed within which incentive funds must be expended or committed to the acquisition of general service boxcars,

(4) whether carriers which fail to acquire their normal complement of such cars and, consequently, are unable to draw down the incentive funds within a specified period, should be required to return the funds collected to the debtor carriers, and (5) other methods to facilitate the use of the accrued incentive per diem funds for the purchase, building, or rebuilding of general service, unequipped boxcars, and (6) whether any group of carriers should be exempt from the payment of incentive per diem. Petitions for reconsideration of the April 24th Order were filed for the purpose of including in the Commission's reopened proceedings the question whether the IPD program should be completely eliminated. The Commission denied these petitions on May 25, 1973.[8]

It should be noted that throughout the Commission's proceedings the Commission has emphasized that the IPD program was an "open ended" proceeding in which the carriers were encouraged to make suggestions from time to time for improvement.[9] The Commission recognized that it was embarking on a new enterprise in which suggestions for change would be encouraged.

This court, by Order of September 18, 1973, denied without prejudice defendant intervenors' motion to dissolve the temporary restraining order issued by the single judge.[10] We also denied in part and granted in part a motion by plaintiffs and intervening plaintiffs to strike portions of the briefs filed by the defendants and to reject excerpts from the Commission's record in the IPD proceedings made prior to April 28, 1970. Intervening defendants now urge that this action be dismissed citing in support thereof the grounds argued in favor of their motion to dissolve the temporary restraining order. Intervening defendants contend that the doctrine of primary jurisdiction as articulated by the Supreme Court in Atchison, Topeka & Sante Fe Railway Co. v. Wichita Board of Trade, 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973) precludes consideration by this court of the matters raised in plaintiffs' complaint until the Commission determines the issues raised by its Order of April 24th reopening the IPD proceedings. Finally, plaintiffs renew their motion to strike portions of defendant intervenors' brief and to reject the material submitted to the Commission prior to April 28, 1970.

## II. Preliminary Matters

### (A) Primary Jurisdiction

Application of the doctrine of primary jurisdiction requires a close scrutiny of the functions committed by Congress to the courts and to the agency whose action is being reviewed. Courts must be wary that in exercising the functions committed to them by Congress they do not usurp matters which Congress intended be left to the primary concern of the agency. Thus, while a court may have the power to determine that an agency has erred, the court should not exercise that power in such a manner as to substantially impede an agency's determination of matters committed to it by Congress.

Atchison, Topeka and Sante Fe Railway Co. v. Wichita Board of Trade, 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973) concerned the circumstances in which a court may exercise its power to

---

8. At oral argument on plaintiffs' request for a permanent injunction counsel for the Commission stated that the Commission was not narrowing the evidence presented in the reopened proceedings to the six areas listed by the Commission in its Order of April 24th. We believe, however, that the Order speaks for itself.

9. The Supreme Court noted this fact in United States v. Florida East Coast R. Co., 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973).

10. The court reasoned that since the six-month period for IPD had gone into effect at the time this court was able to hear intervening defendants' motion, it would produce no harm to await decision on the grounds tendered in support of dissolving the temporary restraining order until final decision of the merits.

**108**

enjoin a proposed rate change after a final order by the Commission that the rate change proposed by rail carriers was reasonable. The Commission found reasonable the proposed implementation of new rates for the inspection of grain while in-transit. Allowing the rail carriers to impose separate charges for in-transit inspection was a departure from the Commission's long standing policy that it would not allow a separate charge for an accessorial service previously performed as part of the line-haul rates without substantial evidence that such an additional charge was justified measured against the overall services rendered and the overall reasonableness of the increased line-haul rate resulting therefrom. The Commission had made no attempt to consider the reasonableness of continuing the existing line-haul rate, which included some charge for in-transit inspection. The District Court held that the Commission's finding of reasonableness could not be sustained and remanded the matter to the Commission for further proceedings. The court, however, also suspended the rates proposed by the rail carriers.

While affirming the district court order remanding the proceedings to the Commission, the plurality opinion of Mr. Justice Marshall held that the power to enjoin proposed rate changes upon review of a final determination of the Commission, a power the Court considered was "at best ancillary to the general equitable power of the reviewing court", should not be exercised by a court when the Commission's error in finding the rate increases reasonable was that the Commission failed to adequately explain its departure from prior well established policy.[11] In remanding the case to the Commission, questions concerning the reasonableness of the proposed rates were not finally determined. Enjoining the implementation of the rates involved the court in deciding matters which Congress committed to determination by the Commission. Considering whether to issue an injunction pending final determination by the Commission requires the court to determine the likelihood of success on the merits by the party challenging the agency action and the nature of the public interests affected. A determination by the court of the likelihood of success on the merits will impinge on the Commission's authority to consider the effect of rate changes on national transportation policy and on the public interest. It is for these reasons "that a decision to enjoin rates pending reconsideration by the Commission in order to clarify its policies will imply some view by the District Court about decisions committed to the Commission by the doctrine of primary jurisdiction." Atchison, Topeka and Sante Fe Railway Co. v. Wichita Board of Trade, *supra,* 412 U.S. at 825, 93 S.Ct. at 2384.

No similar considerations precluding us from proceeding to determine the relief requested by plaintiffs are present in the case before us. Initially, the difference in the agency action challenged in *Wichita* and in the case before us must be made clear. In *Wichita* the Commission's Order merely stated that the proposed new or increased charges for in-transit inspection of grain were just and reasonable. The reviewing court, in an action sustained by the Supreme Court, declared that the Commission's finding was not sustainable and the Commission must, therefor, reconsider its finding of reasonableness of the rate changes. In the case before us the Commission's Order imposes IPD charges on a yearly basis. A determination that such an order is unreasonable has the necessary effect of terminating IPD charges on a yearly basis since it is on the Commission's authority alone that such charges are imposed. In *Wichita* the rail carriers themselves

---

11. Three Justices felt that the court had no power to enjoin the rates even after a finding of reasonableness by the Commission. Mr. Justice Douglas believed that the district court had properly exercised its power, and Mr. Justice Powell did not participate in the consideration of the case.

were given authority by Congress to impose rate changes, and it was these changes that the district court enjoined.

■ Thus, the allocation of responsibility between courts and agencies is completely different in this case from that involved in *Wichita*. Congress has given the courts the responsibility to determine the reasonableness of rules promulgated by the Commission under § 1(14)(a). We are not limited to determining whether the Commission's determination of reasonableness of rates imposed by rail carriers is supported by substantial evidence.

■ The power afforded the court is also a measure of the proper role desired by Congress. We do not deal here with the narrowly circumscribed power to prevent irreparable harm pending review of alleged administrative error as was the case in *Wichita*. Our power to enjoin the imposition of IPD charges on a yearly basis upon a finding of unreasonableness is explicit and serves the substantive role of judicial review of agency action afforded the courts by Congress. We do not determine what rule imposing IPD should be allowed in the first instance. That task is for the Commission. But once the Commission has taken final action in establishing a rule, the court's review is available upon proper pleading.

■ Defendants do not contend that the action challenged by the plaintiffs is not final. Rather, they contend that since the Commission is considering aspects of IPD as now structured which reconsideration may obviate some of plaintiffs' past disagreements with the rule, this court should not proceed further until the Commission has completed its reconsideration. But it seems clear that the actions plaintiffs challenge are not being reconsidered by the Commission, that is, the elimination of IPD and the unreasonableness of extending IPD. Furthermore, even were the Commission reconsidering the matters raised by plaintiffs, that alone should not deprive the plaintiffs of judicial review at this time. As we have noted the Commission has stated on numerous occasions that it continuously reviews the rules governing the IPD program. Continuous review by the Commission could, if we were to accept defendants' contention, effectively deprive plaintiffs of the right to judicial review granted them by Congress. The Commission has acted with enough finality and resoluteness to allow this court to determine the reasonableness of the action taken by it. Our determination of the reasonableness of the action taken by the Commission does not dictate in any way the nature of future rules the Commission may wish to promulgate.

### (B) Record before the Court

Plaintiffs have objected to inclusion in the record before this court of certain matters which were not part of the formal record before the Commission when it decided to extend IPD to a yearly basis. The formal record, plaintiffs contend, consists solely of the submissions by the parties in the Ex Parte No. 252 (Sub. No. 1) proceedings which were in response to the Commission's March 6th Order. It is clear, however, that the record before this court is not so limited.

■ The proceedings in Ex Parte No. 252 (Sub. No. 1) Incentive Per Diem Charges are an exercise of the Commission's rule-making function. The Supreme Court has so held. United States v. Florida East Coast Railway Co., 410 U.S. 224, 244–246, 93 S.Ct. 810, 35 L. Ed.2d 223 (1973). The extension of IPD to a yearly basis was the exercise of the Commission's rule-making functions. In a rule-making proceeding the record before the court consists of any matter which could reasonably be said to have been before the Commission, whether produced by the Commission itself or by other parties, when the Commission took the action being challenged. *See* United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972). California Citizens' Band Association v. United States,

375 F.2d 43 (9 Cir.) cert. denied, 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967); Pacific Coast European Conference v. United States, 350 F.2d 197 (9 Cir.), cert. denied, 382 U.S. 958, 86 S. Ct. 433, 15 L.Ed.2d 362 (1965).

We have stricken from the defendant intervenors' memorandum of law references to those matters which clearly could not have been before the Commission when it entered its Order extending IPD yearly. The other matters complained of by plaintiffs are properly before the court.[12]

### III. Failure to Reopen the Proceedings

To the extent that the Commission's Order of April 24, 1973 reopened the IPD proceedings to consider matters raised by the various petitions for reopening filed in the summer of 1972, these matters are now moot. Plaintiffs contend, however, that the Commission's April 24th Order does not provide for reconsideration of the use of IPD *vel non*. The Order does not on its face request responses to the issue whether IPD should be used at all. We will, therefore, consider whether the Commission's failure to reconsider the use of IPD at all was an abuse of discretion or constituted agency action unlawfully withheld or unreasonably delayed. *See* 5 U.S.C. § 706(1) and (2)(A) (1970); Atchison, Topeka & Santa Fe Railway Co. v. United States, 284 U.S. 248, 52 S. Ct. 146, 76 L.Ed. 273 (1932).

Plaintiffs rely primarily upon *Atchison* for this court's authority to compel the Commission to consider eliminating IPD charges. In *Atchison* the Court considered an abuse of discretion the Commission's denial of reconsideration of an order prescribing the maximum rates for the transportation of grain and grain products on domestic shipments.

The maximum rates ordered by the Commission were based on an investigation conducted prior to the Great Depression. The order setting the maximum rates, however, was entered after the collapse of the economy. Denial by the Commission of the petition for reconsideration was an abuse of discretion since the petition presented evidence of a radically different economic situation from that prevailing when the Commission closed its investigation.

Subsequent decisions have, however, severely narrowed application of the *Atchison* rationale. In United States v. Pierce Auto Freight Lines, Inc., 327 U. S. 515, 66 S.Ct. 687, 90 L.Ed. 821 (1946) the Court stated:

That case, as has been indicated more than once, was "promptly restricted . . . to its special facts, United States v. Northern Pac. R. Co., 288 U.S. 490, 53 S.Ct. 406, 77 L.Ed. 914, and it stands virtually alone." Interstate Commerce Commission v. Jersey City, 322 U.S. 503, 515, 64 S.Ct. 1129, 1135, 88 L.Ed. 1420; see also Baltimore & Ohio R. Co. v. United States, 298 U.S. 349, 389, 56 S.Ct. 797, 817, 80 L.Ed. 1209. Except in the single instance, it has been held consistently that rehearings before administrative bodies are addressed to their own discretion. Interstate Commerce Commission v. Jersey City, *supra*. Only a showing of the clearest abuse of discretion could sustain an exception to that rule.

*Supra*, 327 U.S. at 534–535, 66 S.Ct. at 697. See also, Carolina Freight Carriers Corp. v. United States, 323 F.Supp. 1290, 1296 (W.D.N.C.1971); Illinois Central Railroad Co. v. United States, 263 F.Supp. 421, 434 (N.D.Ill.1966) aff'd 385 U.S. 457, 87 S.Ct. 612, 17 L. Ed.2d 509 (1967).

The Administrative Procedure Act provides a further basis for review

---

12. Plaintiffs object to references in defendant-intervenors' memorandum of law to affidavits filed by defendant-intervenors in support of the motion to dissolve the temporary restraining order, references in the joint memorandum of law of the Commission and Secretary of Agriculture to an affidavit filed with the memorandum and statements filed by the parties in response to the December 1969 Order proposing IPD.

of an agency's action in failing to reconsider a decision. The question can be framed either in terms of whether the court should compel agency action unlawfully withheld or unreasonably delayed, 5 U.S.C. § 706(1), or in terms of whether the agency abused its discretion in refusing to reconsider the petition for rehearing. 5 U.S.C. § 706(2)(A). It is unclear what effect review pursuant to the APA would have on the principle of *Atchison* as narrowed by *Pierce Auto*. Compare Cargo Express, Inc. v. United States, 345 F.Supp. 577 (M.D.Ohio 1970); State of Oklahoma v. United States, 193 F.Supp. 261 (W.D.Okl. 1961). The narrow scope of review provided by *Atchison* would seem particularly inappropriate when the agency professes, as the Commission has in this case, that the proceeding conducted is an open-ended rule-making one. In making rules of general applicability the agency needs to encourage participation by the parties affected. See National Labor Relations Board v. Wyman-Gordon Co., 394 U.S. 759, 775, 780, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (Douglas and Harlan dissenting). To an extent rule-making loses its efficacy when the agency is viewed by the participants as being unresponsive to suggestions for change and modification. However, whether review is based on the narrow basis provided by *Atchison* or on a perhaps broader basis pursuant to the APA, the Commission's action in this case must be sustained.

While the vast majority of petitions for reopening of the IPD proceedings filed in the summer of 1972 were critical of the IPD program as structured, few petitioning parties sought termination of IPD.[13] Furthermore, the alleged defects in the IPD program focused upon by those seeking elimination of IPD as evidence that the use of IPD at all was unreasonable were curable by restructuring the program. Modification of IPD to include purchase of freight cars other than boxcars, to change the

rules governing earmarking of funds and the test period requirement were certainly reasonable alternatives to elimination of IPD. We cannot therefore conclude that the Commission abused its discretion by determining that consideration of substantive modifications to the IPD program was preferable to consideration of eliminating the IPD program.

### IV. Lawfulness of Extending IPD to Yearly Application

The March 30, 1973 Order extending IPD to a yearly basis is attacked on both procedural and substantive bases. We deal first with the procedural challenge.

#### A. Opportunity to Reply to Submissions

United States v. Florida East Coast Railway Co., 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973), is dispositive of the procedural issue before us. In *Florida East Coast* the Court upheld the procedures used by the Commission in promulgating its Order of April 28, 1970. The Court held that the procedures utilized by the Commission conformed to the procedural requirements of 5 U.S.C. § 553 and § 1(14)(a) of the Interstate Commerce Act.

The only material difference alleged by plaintiffs to exist between the procedures involved in promulgation of the Commission's April 1970 Order as opposed to its March 1973 Order is that the latter did not require that responses to the proposed order be served on other parties and that the parties were not able to reply to the responses submitted by the other parties. Plainly, neither of these procedures is required by 5 U.S.C. § 553. In holding § 553 applicable to the Commission's actions in the IPD program, the Court determined that the proceeding was a rule-making one governed by § 553. The Commission's March 1973 Order is simply another phase in the IPD rule-making proceedings. Since § 553 does not require serv-

---

13. The following participants sought elimination of IPD: Kansas City Board of Trade, C&O/B&O, Denver and Rio Grande, and Penn Central.

ice of responses on other participants nor the right to reply to such responses, the procedures utilized by the Commission in promulgating its March 1970 Order did not violate § 553. And since the Court has determined that the hearing requirements of § 553 satisfy the hearing requirements of § 1(14)(a) of the Interstate Commerce Act, we do not find procedural error in the promulgation by the Commission of its March 1973 Order.

### B.  Extension of IPD to Year-Round Basis

The substantive challenge to the Commission's extension of IPD to a year-round basis is presented in several different forms. First, it is argued that the extension of the IPD rules as applicable during the six month, September to February, period was not reasonable within the meaning of § 1(14)(a) of the Interstate Commerce Act. Secondly, plaintiffs contend that the extension of IPD was based solely on the concern for car utilization and that the Commission ignored the statutory objective of increasing car acquisition. Finally, the Commission is said to have erred by imposing an overall annual 18% rate of return for use of boxcars by extending this rate to a year-round basis, since the Commission had previously found the 18% rate of return to be unjust and unreasonable.

The statute, 49 U.S.C. § 1(14)(a), conditions the imposition of incentive per diem charges upon a finding of an inadequate supply of the particular freight car upon which the Commission seeks to impose the charge. Although plaintiffs complain that the Commission imposed IPD during a period from early 1971 to late 1972 when there allegedly was no shortage of boxcars, it is conceded by plaintiffs that a shortage of boxcars did exist in the early part of this year when the Commission extended IPD. Furthermore, the imposition of IPD charges must seek to obtain the following statutory goals: (1) the incentive element must provide just and reasonable compensation to freight car owners, (2) the incentive element must contribute to sound car practices (including efficient utilization and distribution of cars), and (3) the incentive element must encourage the acquisition and maintenance of a car supply adequate to meet the needs of commerce and the national defense.

The principles of judicial review governing our determination of the lawfulness of the Commission's action in extending IPD to a year round basis are set forth in United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 92 S. Ct. 1941, 32 L.Ed.2d 453 (1972). In Allegheny-Ludlum the Court stated:

The standard of judicial review for actions of the Interstate Commerce Commission in general, Western Paper Makers' Chemical Co. v. United States, 271 U.S. 268 [46 S.Ct. 500, 70 L.Ed. 941] (1926), and for actions taken by the Commission under the authority of the Esch Act in particular, Assigned Car Cases, 274 U.S. 564 [47 S.Ct. 727, 71 L.Ed. 1204] (1927), is well established by prior decisions of this Court. We do not weigh the evidence introduced before the Commission; we do not inquire into the wisdom of the regulations which the Commission promulgates, and we inquire into the soundness of the reasoning by which the Commission reaches its conclusions only to ascertain that the latter are rationally supported. In judicially reviewing these particular rules promulgated by the Commission [the car service rules], we must be alert to the differing standard governing review of the Commission's exercise of its rulemaking authority, on the one hand, and that governing its adjudicatory function, on the other:

"In the cases cited, the Commission was determining the relative rights of the several carriers in a joint rate. It was making a partition; and it performed a function quasi-judicial in its nature. In the case at bar, the function exercised by the Commission is

wholly legislative. Its authority to legislate is limited to establishing a reasonable rule. But in establishing a rule of general application, it is not a condition of its validity that there be adduced evidence of its appropriateness in respect to every railroad to which it will be applicable. In this connection, the Commission, like other legislators, may reason from the particular to the general." Assigned Car Cases, *supra*. at 583 [47 S.Ct. 727].

406 U.S. 748–749, 92 S.Ct. 1946.

Much criticism can be lodged at the results obtained thus far by the use of IPD charges as currently structured. It is clear, for example, that the shortage of boxcars has increased. It is arguable, however, whether the rate of such decline has increased or decreased since the inception of IPD. A substantial portion of the funds collected by owner railroads has not been expended to increase car supply. Much of the funds collected have been lost to payment of tax by the owner railroads. Even those railroads supporting the extension of IPD have sharply criticised the rules requiring that only boxcars be purchased with IPD funds and that the funds only be reached after satisfying a test period average purchase of cars from the railroads' own funds before use of the IPD funds. It is not our task, however, to pronounce whether the IPD program has been a success or a failure. Rather, our task is simply to ascertain whether there existed a reasonable basis for the Commission's extension of IPD.

We believe that there was a proper basis for the Commission's extension of IPD. Evidence before the Commission demonstrated a sharp increase in the need for boxcars in that period of the year in which the Commission had previously felt there was no substantial need for boxcars. The shortages of boxcars had increased at a drastic pace according to the information supplied by the Association of American Railroads. While there were surplusages of boxcars

in areas of the country, the sharp increase in shortages of boxcars in the early part of 1973 was certainly sufficient evidence to cause a change of belief about the patterns of car shortages during the year. In addition, a substantial number of the responses to the Commission's March 6th Order were favorable to a year-round application of IPD. Indeed, many carriers had initially proposed year-round application of IPD when the rules were first proposed in December 1969. This information provided a sufficient basis in reason for the Commission's action in extending IPD to a year-round application.

Finally, it is also arguable whether the use of an 18% rate of return provides unjust and unreasonable compensation to the owner railroads. The Commission has argued that an 18% rate of return will not actually be realized since boxcars are used by other than owner railroads less than 50% of the time. This is a change of reasoning from that employed when the average rate the Commission sought owner carriers to obtain was 12%. No mention was made when the Commission first imposed IPD of the factor of cars off-line as affecting the determination of a just and reasonable rate of return. The Commission is not inextricably bound, however, in a rule-making proceeding by its prior determinations. The responses submitted to the Commission's March 6, 1973 Order do not evidence that year-round application of the 18% rate would be unjust and unreasonable. We do not presume that such a rate is unjust or unreasonable. Moreover, the Commission's conclusion that year-round application of IPD was necessary was based on its finding that the shortage of boxcars had grown more serious. Implicit in this finding would seem to be a determination that an 18% rate of return was needed to serve as a reasonable incentive to stimulate prompt return of, and acquisition of, such cars. Under these circumstances, such rate was no longer unjust or unreasonable.[14]

14. All other contentions raised by the plaintiffs and intervenor plaintiffs have been considered and rejected.

The temporary restraining order issued by the single judge by Order of April 30, 1973 shall be dissolved as of that date. Counsel for the parties shall confer and submit an appropriate form of order within twenty (20) days.

It is so ordered.